UNITED STATES BANKRUPTCY COURT  **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:         :  Chapter 11
           :
AMR CORPORATION, *et al.*,   :  Case No. 11-15463 (SHL)
           :
    Reorganized Debtors.  :  (Confirmed)
-------------------------------------------------------x
JOHN KRAKOWSKI, *et al.*,    :
           :
    Plaintiffs,     :
           :
    vs.      :  Adv. Pro. No. 13-01283 (SHL)
           :
AMERICAN AIRLINES, INC., *et al.*, :
           :
    Defendants.   :
-------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S:**

**GREEN JACOBSON P.C.**
*Counsel for Plaintiffs*
7733 Forsyth Blvd., Suite 700
Clayton, Missouri 63105
 By: Allen P. Press, Esq.

**WEIL, GOTSHAL & MANGES**
*Counsel for American Airlines, Inc.*
767 Fifth Avenue
New York, New York 10153
 By: Steven Karotkin, Esq.
    Alfredo R. Perez, Esq.
    Stephen A. Youngman, Esq.
    Lawrence J. Baer, Esq.

**MORGAN LEWIS & BOCKIUS LLP**
*Counsel for American Airlines, Inc.*
1111 Pennsylvania Avenue, N.W.
Washington D.C. 20004
 By: Jonathan C. Fritts, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of Defendant American Airlines, Inc. seeking to dismiss the modified supplemental class action complaint in the above-captioned adversary proceeding. Plaintiffs are American Airlines' pilots who previously worked at TWA. At American, Plaintiffs enjoyed special job opportunities at the St. Louis hub until those opportunities ended when the pilots' collective bargaining agreement was abrogated in American's bankruptcy. Plaintiffs allege that their union—the APA— breached its duty of fair representation in ten ways regarding Plaintiffs' loss of those special opportunities, including failing to bargain for Plaintiffs in connection with the lost opportunities, failing to replicate the lost opportunities, and failing to fairly represent Plaintiffs in an arbitration to provide substitute job protections. Unhappy with the results of that arbitration, they seek a declaration voiding the arbitrators' award, among other things.

For the reasons set forth below, the Court dismisses the first four claims in light of the prior proceedings before this Court to abrogate the pilots' collective bargaining agreement under Section 1113 of the Bankruptcy Code and the Court's subsequent approval of a new agreement. But the Court denies the rest of the motion, finding that Plaintiffs have stated claims regarding the conduct of the arbitration, the merits of which require further factual development.

## BACKGROUND

As it must on a motion to dismiss, the Court assumes to be true all the facts in the complaint. In April 2001, American acquired the assets of former airline TWA, including its unionized employees. Plaintiffs' Modified Supplemental Class Action

2

Complaint [ECF No. 48] ("MSCompl.") ¶ 1.  Given the acquisition, American and the

APA negotiated and executed an addendum to their collective bargaining agreement

entitled "Supplement CC," which provided terms for integrating legacy TWA pilots into

American's pilot seniority list.  MSCompl. ¶ 8.  Supplement CC completely subordinated

the seniority of about 1,200 legacy TWA pilots to that of all American pilots.

MSCompl. ¶ 9.  The seniority of the remaining 1,100 legacy TWA pilots was reduced by

Supplement CC, and they were reintegrated into American's seniority list at their reduced

seniority level.  MSCompl. ¶ 9.  But to compensate for this loss of seniority, Supplement

CC constructed a "protective 'fence' in St. Louis," which created a minimum number of

Captain and First Officer positions in St. Louis and granted the legacy TWA pilots

preferential bidding for these positions.  MSCompl. ¶ 10.  So, while reducing the

seniority of legacy TWA pilots put them at a relative disadvantage for purposes of

bidding against 8,000 American pilots for positions on other routes, the protective fence

guaranteed a certain number of desired positions on routes from St. Louis.  MSCompl. ¶¶

10-11.  The protective fence in St. Louis was the only consideration the legacy TWA

pilots received for their reduced seniority. MSCompl. ¶ 14.

        The APA has "long desired to terminate Supplement CC, and the protective

fence in St. Louis it provided" for the legacy TWA pilots.  MSCompl. ¶ 46.  American

knew of the APA's hostility toward legacy TWA pilots after May 2012.  MSCompl. ¶ 52.

A former APA president promised as part of his election platform to remove the St. Louis

fence without restoring seniority to the legacy TWA pilots.  MSCompl. ¶ 46.  After

American filed for Chapter 11 bankruptcy protection in November 2011, it represented

that it would "close its St. Louis base and eliminate the protective fence by the end of

2012." MSCompl. ¶¶ 12-13.  The legacy TWA pilots contended that either their pre-integration seniority should be restored or the protective fence maintained. MSCompl. ¶ 15.

At some point, American proposed sending this issue to arbitration, and "initially proposed a seemingly fair dispute resolution mechanism as to the [legacy] TWA pilots['] issue that did not limit the arbitrators' remedy." MSCompl. ¶ 53.  But American and the APA later agreed that the arbitrators would be powerless to restore the legacy TWA pilots' seniority.  MSCompl. ¶ 53.  Thus, the "APA, in collusion with American, agreed that American [could] close the St. Louis base, and that . . . an arbitrator [would] decide what if any protection should be afforded" to the legacy TWA pilots.  MSCompl. ¶ 15. But "under no circumstance [could] the arbitrator modify the [legacy] TWA pilots' seniority at American." MSCompl. ¶ 15.  This agreement would be implemented later through the collective bargaining agreement process.  MSCompl. ¶ 16.

Plaintiffs' original complaint in this case alleged that the APA breached its duty of fair representation by agreeing with American to take seniority off the table as a possible remedy in the arbitration, regardless of the ultimate result of that arbitration.  *See Krakowski v. Am. Airlines, Inc. (In re AMR Corp.),* 2014 WL 2508729, at *1 (Bankr. S.D.N.Y. June 3, 2014).  In June 2014, however, this Court granted the APA and American's motions to dismiss the original complaint.  *Id*. at *6.  In the June decision, the Court concluded that the Plaintiffs had not alleged sufficient facts to plausibly show that the seniority restriction on the Supplement CC arbitration—in and of itself—fell outside the APA's legitimate union objectives.  *Id.* at *4.  In reaching its June decision, the Court observed that the Plaintiffs' seniority had been lost more than a decade before when

American acquired TWA and that the results of the arbitration were unknown. *Id*. at *4-5.

The parties refer to events in the main bankruptcy case.[1] The Court takes judicial notice of the proceedings in this bankruptcy case which are relevant to this motion.[2] These are the Section 1113 proceedings—discussed in Plaintiffs' Modified Supplemental Complaint—that granted authority to the Debtors to reject the collective bargaining agreement with the APA and ultimately led to a new agreement. *See, e.g.*, MSCompl. ¶ 17 ("American's contract impasse with APA led it to seek authority from the Bankruptcy Court to reject its then existing collective bargaining agreement pursuant to [Section] 1113. Its [Section] 1113 motion was granted on September 12, 2012, and American rejected its collective bargaining agreement with APA."). In the Section 1113 proceedings, Debtor American Airlines sought permission to abrogate its collective

---

[1]    *See, e.g.*, Plaintiffs Opp. at 1 ("The lengthy set of facts underlying this case have been briefed several times in this and the related case. Plaintiffs will not repeat them here . . . ."); Motion to Dismiss, at 2 ("This motion . . . is based on the facts alleged . . . and matters of which this Court may take judicial notice, including prior decisions. The Court can take notice of its own docket and the decisions already rendered."); Motion to Dismiss, at 3-4 ("During the bankruptcy reorganization proceedings, American sought to negotiate a new collective bargaining agreement with APA. . . . American petitioned the Court for authority to reject . . . . American and the APA continued to negotiate and eventually agreed to a new collective bargaining agreement.").

[2]    *See In re E.R. Fegert, Inc.*, 887 F.2d 955, 957-58 (9th Cir. 1989) ("Whether these facts were supported by the record in this adversary proceeding is unclear; however, all of the facts are supported by the record of the underlying bankruptcy matter. . . . 'The record in an adversary proceeding in bankruptcy presumes and in large measure relies upon the file in the underlying case. . . .'") (quoting *Berge v. Sweet (In re Berge)*, 37 B.R. 705, 708 (W.D. Wis. 1983)); *Citizens Bank v. Leach (In re Leach)*, 35 B.R. 100, 101-02 & n.5 (Bankr. W.D. Ky. 1983) (bankruptcy judge's use of "entire file" is consistent with the Federal Rules of Evidence given connections between a "case" and a "proceeding") (citing *Leather Comfort Corp. v. Chem. Sales and Serv. Co.* (*In re Saco*), 30 B.R. 862, 865 (Bankr. D. Me. 1983) ("[B]ankruptcy judges would be remiss" if they did not take judicial notice of the debtor's bankruptcy case as a whole, including the documents filed in the case because of bankruptcy's unique interrelated multi-part nature and duty to "notice . . . records and files in [the] cause . . . ."); *cf Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) ("The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case. Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication.") (internal citations and quotation marks omitted). None of the parties have objected to the Court taking judicial notice of the prior proceedings before it in this bankruptcy case.

bargaining agreement with the APA. *See* 11 U.S.C. § 1113 (permitting a debtor to reject a collective bargaining agreement if it demonstrates, among other things, that it has made a proposal for modifications that are necessary for reorganization). The APA opposed the request, as did representatives of the Supplement CC pilots. *In re AMR*, 477 B.R. 384, 411-12, 450-54 (Bankr. S.D.N.Y. 2012). After a three-week trial, the Court issued a decision denying the Debtors' motion, largely agreeing with the need for Section 1113 relief but identifying two flaws in American's proposal for a new collective bargaining agreement. *Id.* at 454. In that decision, the Court rejected the contention that the rights provided under Supplement CC could not be rejected under Section 1113. *Id.* at 451-54 (noting that "nothing in Section 1113 itself . . . supports the notion that a collective bargaining right can exist in perpetuity. Indeed, the case law says otherwise."). After revising their proposal, American once again sought relief under Section 1113, relief that was once again opposed by the APA. *In re AMR*, 478 B.R. 599, 604 (Bankr. S.D.N.Y. 2012). This time the Court granted the motion. *Id.* at 609-10. That decision was affirmed by the District Court. *See In re AMR*, 523 B.R. 415 (S.D.N.Y. 2014). In its decision, the District Court concluded that the old collective bargaining agreement, and the supplements to it, were rejected under Section 1113. *Id.* at 423.[3]

After American abrogated its then-existing collective bargaining agreement with the APA, MSCompl. ¶ 17, American and the APA negotiated a new collective bargaining agreement and multiple related side letter agreements, including letter agreement 12-05

---

[3]    In the appeal, a group of pilots were relying on rights that they claimed still existed under another supplement to the collective bargaining agreement—Supplement B—which contained "a guarantee that American would 'take no action, at any time, by way of notice, negotiations or otherwise, to diminish the pay or the retirement programs' to which these pilots had agreed." *Id.* at 419. The district court rejected the pilots' reliance on this guarantee, concluding that that "the old CBA, including [S]upplement B, was rejected" under Section 1113. *Id.*

("LOA 12-05"). *See* LOA 12-05 [Case No. 11-15463, ECF No. 5626, at 527-29]. LOA 12-05 "confirms [the] agreement concerning the termination of Supplement CC, the planned closure of the STL base, interest arbitration related to that action, and the schedule of any other base closures." *Id*. During a hearing where American sought authority to enter into a new collective bargaining agreement and approve related side letters, including LOA 12-05, the "APA and American represented to the Bankruptcy Court that while LOA 12-05 precluded the arbitrators from modifying the seniority list, [the APA and American's] intent was that the arbitrators would 'replicate' the job protections for former [legacy] TWA pilots created by Supplement CC." MSCompl. ¶ 22.

In its motion, American seeks dismissal on a variety of grounds. It argues that some of Plaintiffs' claims are precluded by the Section 1113 process before this Court or already rejected by a prior decision issued in this adversary proceeding. American also contends that Plaintiffs cannot challenge the results of the arbitration by filing a duty of fair representation claim but must instead seek to directly vacate the arbitration award.

## DISCUSSION

### I.     Applicable Legal Standards

#### A.      Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face."[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). These facts must establish "more than a sheer

---

[4]      Federal Rule of Civil Procedure 12(b)(6) is made applicable to this adversary proceeding by
Federal Rule of Bankruptcy Procedure 7012(b).

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2007). "However, this does not mean that a claim must contain 'detailed factual

allegations' to survive a Rule 12(b)(6) motion to dismiss." *Eastman Chem. Co. v. Nestle

Waters Mgmt. & Tech.*, 2012 U.S. Dist. LEXIS 141281, at *14 (S.D.N.Y. Sept. 28,

2012). In ruling on such a motion, a court must "assum[e] that all the allegations in the

complaint are true." *Id*. at 555. But courts need not "credit conclusory allegations or

legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94

(2d Cir. 2014). Ultimately, the court must determine "whether the well-pleaded *factual*

allegations, assumed to be true, plausibly give rise to an entitlement to relief." *Hayden v.

Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 679) (emphasis

added); *see also Eatz v. DME Unit of Local Union No. 3*, 794 F.2d 29, 34 (2d Cir. 1986)

("[W]hen an action involves a union's duty of fair representation, the Supreme Court

advises the lower courts, as guardians of this duty, to construe complaints . . . to avoid

dismissals and to give plaintiffs the opportunity to file supplemental pleadings unless . . .

beyond doubt . . . a good cause of action cannot be stated.") (citing *Czosek*, 397 U.S. at

27); *Kavowras v. New York Times Co.*, 328 F.3d 50, 53 (2d Cir. 2003).[5]

### B.    The Duty of Fair Representation

"A union 'has a duty to represent fairly all employees subject to the collective

bargaining agreement.'" *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d

Cir. 2010) (quoting *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir.

1998)). This duty requires adequate, honest, and good faith representation. *Air Line

---

[5]    The APA has vigorously contested Plaintiffs' allegations about the conduct of the arbitration in other pleadings filed before this Court. *See* Decl. of Edgar James ¶¶ 2-22 [ECF No. 36-2]; Decl. of Keith Wilson ¶¶ 11-18 [ECF No. 36-3]. But such factual issues are not before the Court on this motion to dismiss.

*Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991) (citing Restatement (Second) of Trusts § 174 (1959) (trustee's duty of care) (additional citations omitted)).  It applies across many contexts, including when challenges are leveled at a union's contract administration, contract enforcement, negotiation efforts, or "instances in which a union is acting in its representative role, such as when the union operates a hiring hall." *O'Neill*, 499 U.S. at 77 (citing *Breininger v. Sheet Metal Workers*, 493 U.S. 67, 87-89 (1989) (additional internal citations and quotations omitted)).  It has been referred to as the "statutory duty of fair representation," but the "doctrine was judicially developed in *Steele [v. Louisville & Nashville R. Co.*] and its progeny," and is more precisely described as "grounded in federal statutes."  *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination . . . .") (citing *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 204 (1944)); *see also O'Neill*, 499 U.S. at 76 ("This description of the 'duty grounded in federal statutes' has been accepted without question by Congress and in a line of our decisions spanning almost a quarter of a century.") (citations omitted); *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) ("The right to bring unfair representation actions is judicially implied from the statute and the policy . . . .  Our function, therefore, is to implement a remedial scheme that will best effectuate the purposes of the Railway Labor Act . . . .") (citations and quotation marks omitted); *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 79 (1989) (explaining an unfair representation claim is a "creature of labor law" and "part of federal labor policy").

To prove a breach of the duty of fair representation, plaintiff must satisfy two elements. *Nikci v. Quality Bldg. Servs.*, 995 F. Supp. 2d 240, 246 (S.D.N.Y. 2014) (quoting *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)); *Vaughn*, 604 F.3d at 709. First, the plaintiff must show "that the union's 'conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.'" *Id.* (quoting *White Rose Food*, 237 F.3d at 179); *Vaughn*, 604 F.3d at 709 (conduct consists of action or inaction). A union's conduct is arbitrary if "'in light of the factual and legal landscape at the time of the union's actions [or inactions], the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Vaughn*, 604 F.3d at 709 (quoting *O'Neill*, 499 U.S. at 67). It is discriminatory if "'substantial evidence'" indicates that the union engaged in discrimination that "'was intentional, severe, and unrelated to legitimate union objectives.'" *Vaughn*, 604 F.3d at 709 (quoting *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). And a union's conduct is in bad faith if there is proof that the union acted with "an improper intent, purpose, or motive" and that action "encompasses fraud, dishonesty and other intentionally misleading conduct." *Vaughn*, 604 F.3d at 709-10 (quoting *Spellacy*, 156 F.3d at 126). A union's good faith "[t]actical errors" or "mere negligence" will not give rise to a breach of the duty of fair representation, because "'[a]s long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.'" *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43-44 (2d Cir. 1989) (quoting *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir. 1985)).

Second, the plaintiff must show "'a causal connection between the union's wrongful conduct and [the plaintiff's] injuries.'"  *Barr*, 868 F.2d at 43-44 (quoting *White Rose Food*, 237 F.3d at 179); *Vaughn*, 604 F.3d at 709.

Duty of fair representation cases "are matters to be decided by the courts in the first instance."  *See, e.g., Ferro v. Ry. Exp. Agency, Inc.*, 296 F.2d 847, 851 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *Boivin v. Cent. Vermont Ry., Inc.*, 1982 WL 177535, at *8 (D. Vt. Feb. 16, 1982) ("It is clear that a federal district court has subject matter jurisdiction over an employee['s] claim against a union for breach of duty of fair representation.") (citing *O'Mara v. Erie Lackawan R.R. Co.*, 407 F.2d 674 (2d Cir. 1969) *aff'd sub nom*, *Czosek v. O'Mara*, 397 U.S. 25 (1970)).  Thus, an employee does not need to exhaust other administrative remedies prior to bringing a duty of fair representation claim.  *Czosek*, 397 U.S. at 28 ("And surely it is beyond cavil that a suit against the union for breach of its duty of fair representation is not within the jurisdiction of the National Railroad Adjustment Board or subject to the ordinary rule that administrative remedies should be exhausted before resort to the courts . . . .") (citations and footnotes omitted)).

An employee bringing a breach of duty of fair representation claim against his union can add his employer as a defendant by alleging the employer's knowledge of or complicity in the union's breach.  *See Long Island City Lodge 2147 etc. v. Ry. Express Agency, Inc.*, 217 F. Supp. 907, 910 (S.D.N.Y. 1963) (National Railroad Adjustment Board lacks primary jurisdiction over employees' hostile discrimination claim against union and employer).  This approach bypasses a fruitless arbitration process in which two collusive parties, the employer and union, could strike a bargain at the employee's expense.  *See Sullivan v. Air Transp. Local 501 TWU*, 2004 WL 2851785, at *2

(E.D.N.Y. Dec. 6, 2004) (citing *Glover v. St. Louis-S.F. Ry. Co.*, 393 U.S. 324, 328-29

(1969) (additional citations omitted)); *see also Boivin*, 1982 WL 177535, at *4 (citing

*O'Mara*, 407 F.2d at 674).

## C.    Judicial Review Under the Railway Labor Act

The Railway Labor Act (the "RLA") separately addresses finality and judicial

review of awards issued by "any division of the [National Railroad] Adjustment Board,"

and awards issued by "a board of arbitration."  *Compare* 45 U.S.C. §§ 153 First (q), (m)

& Second *with* 45 U.S.C. § 159 Third.  Section 159 provides that an award of a board of

arbitration is "conclusive on the parties as to the merits and facts of the controversy"

unless a petition to impeach the award is properly filed on fairly limited grounds:

> (a)    That the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with this chapter;
>
> (b)    That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate; or
>
> (c)    That a member of the board of arbitration rendering the award was guilty of fraud or corruption; or that a party to the arbitration practiced fraud or corruption which fraud or corruption affected the result of the arbitration. . . .  Provided further, that an award contested as herein provided shall be construed liberally by the court, with a view to favorite its validity, and that no award shall be set aside for trivial irregularity or clerical error, going only to form and not to substance.

45 U.S.C. § 159 Third.

As a general matter, if an employee disagrees with a "final and binding"

arbitration award and can show that his union breached its duty of fair representation in a

way that "seriously undermine[d] the integrity of the arbitral process," then that

12

arbitration award is no longer final or binding.  *United Parcel Service, Inc., v. Mitchell*,

451 U.S. 56, 61 (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976))

("[I]f it seriously undermines the integrity of the arbitral process the union's breach also

removes the bar of finality").  Such a tainted award may be vacated.  *See Hines*, 424 U.S.

at 572 (quoting *Margetta v. Pam Pam Corp.*, 501 F.2d 179, 180 (9th Cir. 1974)) ("'To us,

it makes little difference whether the union subverts the arbitration process by refusing to

proceed . . . or follows the arbitration trail to the end, but in so doing subverts the

arbitration process . . . .  In neither case, does the employee receive fair representation.'").

  While the *Hines* decision involved the Labor Management Relations Act of 1947,

29 U.S.C. §§ 141 *et seq.*, the duty of fair representation exception to finality and remedy

of vacatur of a tainted final and binding arbitration award is similarly available under the

RLA.  *See, e.g., Barnett v. United Air Lines, Inc.*, 738 F.2d 358, 362 (10th Cir. 1984) ("If

an employee can establish that his union breached its implied duty of fair representation,

then even a *binding* decision of the board can be set aside if the breach seriously

undermined the integrity of the arbitral process.") (citing *Hines*, 424 U.S. at 567); *Del

Casal v. E. Airlines, Inc.*, 634 F.2d 295, 299 (5th Cir. 1981) (applying *Hines*, but

declining to vacate the System Board's final and binding conclusions because the facts

did not show that the union's breach of its duty of fair representation seriously

undermined the integrity of the arbitral process).  Indeed, many courts assume the

application of this duty of fair representation exception to final and binding awards under

the RLA without discussion.  *See, e.g., Del Casal*, 634 F.2d at 299 (citing *Hines* for

existence of duty of fair representation exception and, without further discussion,

13

applying it to determine that "[h]ere, the union's breach . . . did not 'seriously undermine' the integrity of the arbitral process.").

## II.    The Plaintiffs' Alleged Breaches of the Duty of Fair Representation

The Plaintiffs allege that the "APA violated its duty to fairly represent the plaintiffs and the putative Class" in ten ways.  MSCompl. ¶ 48(A)-(J).  These alleged breaches cover three general categories: 1) failing to bargain about the termination of Supplement CC and agreeing to terminate Supplement CC without securing equivalent job protections, MSCompl. ¶¶ 48(A)-(B); 2) precluding the Supplement CC arbitrators from addressing seniority and failing to pursue something to "replicate" the Supplement CC job protections, MSCompl. ¶¶ 48(C)-(D); and 3) claims that the Supplement CC arbitration was not procedurally appropriate or fair, including problems with the selection of the arbitrators, the participants, and the lawyers, MSCompl. ¶¶ 48(E)-(J).  Plaintiffs further allege that American knew of and colluded with the APA in these breaches. MSCompl. ¶¶ 52-53.

### A.    Plaintiffs' First Two Claims Fail to Allege a Breach of the APA's Duty of Fair Representation Because They Ignore the Section 1113 Proceedings in This Bankruptcy

In its first two claims, Plaintiffs complain that the APA failed to bargain on their behalf as to the termination of Supplement CC and that APA agreed with American to terminate Supplement CC without securing equivalent job protections.  MSCompl. ¶¶ 48(A)-(B).  But these claims cannot survive given the Section 1113 proceedings in American's bankruptcy.  As those proceedings make clear, the APA collective bargaining agreement—including Supplement CC—remained in effect until American received Court approval to reject the collective bargaining agreement, including Supplement CC.

APA opposed the termination of the collective bargaining agreement at every turn, as did the Supplement CC Pilots.[6]  Ultimately, American rejected its collective bargaining agreement with the APA after contentious Section 1113 proceedings.  Until it was rejected, former TWA pilots had—and exercised—rights under Supplement CC, which was part of the underlying collective bargaining agreement between American and the APA.  But the former TWA pilots' Supplement CC rights ceased to exist when American rejected the underlying APA collective bargaining agreement.  Hr'g Tr. 76:14-22, Dec. 19, 2012 [Case No. 11-15463, ECF No. 6282].

Plaintiffs seek to avoid the consequences of the Section 1113 proceedings by arguing that the APA breached its duty of fair representation before the Section 1113 proceedings began.  More specifically, they allege that before American was even authorized to reject Supplement CC, the APA had agreed—without bargaining on Plaintiffs' behalf—that American can close the St. Louis base and that an arbitrator will decide what protections, if any, should be afforded the former TWA pilots.  MSCompl. ¶¶ 15-16.  But Plaintiffs concede that this "agreement" before the Section 1113 proceeding was only a piece of the negotiations between American and the APA, which ultimately were unsuccessful.  *See* MSCompl. ¶ 17 (discussing impasse in negotiation caused American to seek Section 1113 relief).  As this Court previously recognized in the Section 1113 proceeding:

---

[6]        The APA made many attempts to prevent American from rejecting its collective bargaining agreements, which included Supplement CC.  *See, e.g.*, Brief of APA for American's Proposals Pursuant to Section 1113 [Case No. 11-15463, ECF No. 2577]; APA's Memorandum in Opp'n to Motion to Reject Pursuant to Section 1113 [ECF No. 2722]; APA's Objection to Debtors' Motion in Limine [ECF No. 2794]; APA's Supplemental Authority in Opposition to Debtors' Motion to Reject Pursuant to Section 1113 [ECF No. 2895]; APA's Appeal for Rejection Pursuant to Section 1113 [ECF No. 4232]; APA's Objection to Motion to Reject [ECF No. 4251]; APA's Amended Declaration in Opposition to Section 1113 Rejection [ECF No. 4285].

> Because of the complicated nature of these collective
> bargaining agreements, the parties negotiate on an issue-by-
> issue basis with each issue subject to the normal tradeoffs
> inherent in collective bargaining.   Notwithstanding any
> meeting of the minds on a particular issue, the parties have
> no agreement on a collective bargaining agreement until
> such time as a union sends out a specific proposed agreement
> for a vote and it is ratified by the union membership.   So
> while the parties at Trial made repeated references to
> agreements on specific issues reached during negotiations,
> those reflect only progress towards an agreement, not a
> binding agreement itself.

*In re AMR Corp.*, 477 B.R. at 403 n.9.[7]  And when negotiations hit an impasse, American

sought and received authority to reject the collective bargaining agreement with the APA,

causing the former TWA pilots to lose their rights to the special job protections in

Supplement CC.  Hr'g Tr. 76:14-22, Dec. 19, 2012; *see Nw. Airlines Corp. v. Ass'n of*

*Flight Attendants-CWA* (*In re Nw. Airlines Corp.*), 483 F. 3d 160, 173 (2d Cir. 2007) (a

debtor's abrogation of its collective bargaining agreement under Section 1113 terminates

the parties' agreed-to working conditions and absolves them of status quo duties under

the RLA); *In re AMR Corp.*, 477 B.R. at 453.  Given that rejection of Supplement CC

only occurred as a result of this Court's grant of American's Section 1113 request, the

Court concludes that Plaintiffs have not plausibly plead a fair representation claim in

paragraphs 48 (A)-(B).

---

[7]     The record reflects that the APA and American engaged in some negotiations about Supplement
CC.  *See, e.g.,* Memo. in Support of 1113, Part Two: APA-Pilots, at 49-50 [Case No. 11-15463, ECF No.
2042] ("American originally proposed to eliminate these [minimum staffing] provisions [in St. Louis
created by Supplement CC] and close its base in St. Louis.  However, after negotiations with APA, the
Company has accepted APA's proposal to solve the issue of any new protections for former TWA pilots
through interest arbitration.").

### B.      Plaintiffs' Third and Fourth Claims are Dismissed

In claims three and four, Plaintiffs complain that the APA falsely represented to
the Bankruptcy Court that the intent of the LOA 12-05 arbitration was to "replicate"
Supplement CC's job protections and that the APA wrongly agreed with American to
preclude the LOA 12-05 arbitrators from modifying the former TWA pilots' seniority.
MSCompl. ¶ 48(C) & (D).

Turning to the first allegation, the Court concludes that the representation about
"replicate" is not a basis for a duty of fair representation claim.  The actual terms of LOA
12-05 were presented to the Court as part of the request to approve the new collective
bargaining agreement.  *See* Mot. for Order Authorizing Entry into Collective Bargaining
Agreement and Settlement Letter and Approving Settlements in Connection Therewith
("Mot. Authorizing New CBA"), Ex. B, at 527-28 [ECF No. 5626].  The intent of LOA
12-05 was clear from its written terms: "The Company and the APA agree that a dispute
resolution procedure is necessary to determine what *alternative* contractual rights should
be provided to TWA Pilots as a result of the loss of flying opportunities due to
termination of Supplement CC and the closing of the STL base."  LOA 12-05, at 1 [ECF
No. 5626, page 527 of 529] (emphasis added); *id.* (parties will engage in binding
arbitration "to establish certain terms of the CBA as a *substitute* for the loss of
Supplement CC preferential flying opportunities . . . . .") (emphasis added).

The word "replicate" is not used anywhere in LOA 12-05.  Rather, it was used by
counsel in a court hearing as a short-hand description of the terms of the agreement.  This
informal description does not trump the written terms of the agreement, which was
provided to all interested parties at the time of the hearing.  *See* LOA 12-05, filed Dec. 7,

17

2012; Hr'g Tr., Dec. 19, 2012 [Case No. 11-15463, ECF No. 6282] (hearing on Motion

Authorizing New CBA); *cf. White v. Wash. Pub. Power Supply Sys.*, 692 F.2d 1286, 1289

n.1 (9th Cir. 1982) ("It is settled that to the extent a trial court's oral decision is

inconsistent with a formal written order, the formal order controls"); *Cashco Fin. Servs.*

*v. McGee* (*In re McGee*), 359 B.R. 764, 774 n.9 (9th Cir. 2006) ("[A] judgment is

rendered only when it is set forth in writing, not when it is orally pronounced in court.")

(quoting 11 Fed. Prac. & Proc. Civ. 2D Section).  Indeed, it was clear at the hearing that

the term "replicate" could not to be taken literally as the parties represented that

American intended to close the St. Louis base and, therefore, the job protections for

TWA Pilots at that base would no longer exist.  Hr'g Tr. 31:8-33:10, Dec. 19, 2012 [Case

No. 11-15463, ECF No. 6282] (Mr. James: "[T]he company is closing St. Louise [sic] as

a result of the abrogation of Sup[plement] CC and we said there was protected flying that

we promised those pilots back in 2001 and so we're going to . . . let . . . three respected

neutrals decide how to replicate those [p]rotections."); *see also* LOA 12-05 ("This letter

confirms . . . the planned closure of the STL base . . . .").  Given that fact, it would be

impossible to make an exact copy or duplicate of those St. Louis protections.  *See*

*American Heritage Dictionary*, 1480 (4th ed. 2000) (defining "replicate" as "to repeat,

duplicate, or reproduce"); *Random House Dictionary*, 1634 (2d ed. 1987) (defining

"replicate" as "[t]o duplicate, copy, reproduce, or repeat").

       Taking judicial notice of the proceedings before this Court that are part of this

bankruptcy case, the Court categorically rejects Plaintiffs' reliance on the term

"replicate" as an independent basis for any rights asserted by the Plaintiffs.  *Cf. In re*

*Applin*, 108 B.R. 253, 258 (Bankr. E.D. Ca. 1989) ("'[T]o be given conclusive effect, the

putative admission would have to be deemed a judicial admission. . . .  Some degree of

formality is entailed.  The court has discretion to accept or reject the . . . admission.

Judicial admissions are not made upon ambiguous . . . comments by counsel and are not

made upon inconsistent pleas.") (citations and quotation marks omitted); *see id.* at 259

("An inadvertent statement by counsel is more likely to be treated as an evidentiary

admission . . . [which is] mere evidence . . . not conclusive, and may be contradicted by

other evidence.").[8]

For different reasons, the Court also dismisses the claim in paragraph 48(D) of the

Modified Supplemental Complaint.  This claim complains about the agreement to

preclude the arbitrators from modifying the seniority of the former TWA pilots.  That

issue was squarely presented to this Court and resolved in the Court's decision in June

2014 dismissing the original complaint in this action.  In the original Complaint,

Plaintiffs alleged:

> 28.    APA is violating its duty of fair representation in
> agreeing with American to terminate Supplement CC's
> protective fence and that an arbitrator can fashion some
> "remedy" for the former TWA pilots, which "remedy"
> cannot modify the former TWA pilots' seniority.  This
> agreement is the product of APA's hostility toward the
> former TWA pilots, is facially discriminatory against them,
> and is so unreasonable as to be arbitrary.

Original Complaint ¶ 28.  The June decision dismissed this claim.  In that decision, the

Court rejected the Plaintiffs' position that the only satisfactory remedy in the arbitration

required modifying the seniority of the legacy TWA pilots.  *In re AMR Corp.*, 2014 WL

---

[8]      It is unclear whether the term "replicate" would create any additional rights for the TWA pilots
beyond those that exist by virtue of the terms of LOA 12-05.  But to the extent that Plaintiffs cite to the
word "replicate" as a separate basis for relief in paragraph 48(C)-(D) of the Modified Supplemental
Complaint, the Court rejects that argument and thus dismisses this as an independent claim.

2508729, at *4 (Bankr. S.D.N.Y. June 3, 2014).  The Court recognized that "[r]eopening

seniority affects all pilots at American that are represented by the APA, not just the

Plaintiffs," which required the APA necessarily to balance the interests of the Plaintiffs

and all the other pilots that the APA represents.  *Id*.  The Court concluded that the

Plaintiffs had not alleged anything to infer that the APA's exercise of its discretion on that

issue was discriminatory.  *Id*. at *4-5.  As this issue has already been ruled upon, the

Court dismisses this claim.  *See Aramony*, 254 F.3d at 410 (discussing the doctrine of law

of the case).

### C.    Plaintiffs' Remaining Claims Survive

In its remaining claims, Plaintiffs raise duty of fair representation claims relating

to how the arbitration was conducted.  The allegations range from complaints about how

the arbitrators, lawyers, and participants in the arbitration were selected to the positions

taken by the APA during the arbitration.  MSCompl. ¶¶ 48(E)-(J).  American lumps these

claims together as "allegations concerning the conduct of the interest arbitration

proceeding within the parameters of LOA 12-05," and asserts that "as a result of those

allegations what Plaintiffs are seeking is to vacate the [interest arbitration] award."  Hr'g

Tr. 86:17-87:2, Sept. 4, 2014 (Counsel for American, Mr. Fritts).  American argues that

the "Railway Labor Act prescribes the only way to" impeach an arbitration award, which

is enumerated in Section 159 Third.  *See* Motion to Dismiss, at 13; *see also* 45 U.S.C. §

159 Third.  As Plaintiffs did not seek relief under Section 159 Third, American contends

that these claims must be dismissed.[9]  American categorically asserts that there "is no

---

[9]        American reasons that Plaintiffs elected not to file a claim seeking to vacate the interest arbitration
awards because Plaintiffs could not satisfy those standards, which are "among the narrowest known to the
law."  *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 93 (1978).

[duty of fair representation] exception" to RLA arbitration awards. Hr'g Tr. 131:10-13,

Sept. 24, 2014. More specifically, American contends that where "plaintiffs elected not

to file a petition to vacate or modify the arbitration award, they could not 'now

collaterally attack the . . . award in the context of [a] hybrid claim for breach of the duty

of fair representation.'" Motion to Dismiss, at 14 (citing *Musto v. Transp. Workers

Union of Am.*, 818 F. Supp. 2d 621, 640 (E.D.N.Y. 2011)).

　　　The Court disagrees. In fact, the case law recognizes that a duty of fair

representation claim can be brought independent of a request to vacate an arbitration

result. *See Schum v. South Buffalo Ry. Co.*, 496 F.2d 328, 332-33 (2d Cir. 1974)

(plaintiff brought breach of fair duty of representation claim where reliance on union and

union's failure to timely act caused employer's adverse decision in wrongful discharge

grievance proceeding to become final and binding, but plaintiff did not seek to vacate

employer's decision); *Childs v. Penn. Federation Bhd. of Maint. Way Emps.*, 831 F.2d

429, 432, 441 (3d Cir. 1987) (plaintiff sued for breach of the duty of fair representation

where union agreed with defendant that plaintiff would not raise new contentions in

arbitration, but plaintiff did not move to vacate NRAB's adverse decision); *Peters v.

Burlington N. R. Co.*, 914 F.2d 1294, 1300-02 (9th Cir. 1990), *reh'g denied*, 931 F.2d

534 (1991) (plaintiff claimed that union breached the duty of fair representation by

inexplicably failing to present a strong substantive argument at arbitration survived

defendant's motion for summary judgment, but plaintiff did not request to vacate adverse

decision); *cf. Williams v. Int'l Assn. of Mechanics & Aerospace Workers*, 874 F. Supp.

710, 712-14 (E.D. Va. 1995), *aff'd*, 74 F.3d 1235 (4th Cir. 1996) (court evaluated

evidence in granting summary judgment to defendant where plaintiff claimed the union

breached its duty of fair representation by failing to emphasize plaintiff's case theory and call particular witnesses at an arbitration proceeding but plaintiff never sought to vacate arbitration decision); *see also* The Railway Labor Act, Ch. 5.v.A-F (Chris A. Hollinger, ed., 3rd ed. 2012) (discussing a union's duty of fair representation).

American contends that Plaintiffs' fair representation claim must be dismissed given the participation of former TWA pilots in the arbitration. *See* AMR's Letter Response [ECF No. 63] (citing, among other things, *Del Casal v. E. Airlines, Inc.*, 465 F. Supp. 1254 (S.D. Fla. 1979), *aff'd*, 634 F.2d 295 (5th Cir. 1981)). But the *Del Casal* case is distinguishable. In *Del Casal*, the plaintiff had a union-provided attorney assist with his initial grievance process and the attorney later submitted plaintiff's grievance to the System Board of Adjustment. *Id*. at 1256. But after discovering the plaintiff was not a member of the union, the attorney stopped working with plaintiff and recommended that he retain a private attorney to assist with the upcoming System Board hearings. *Id*. at 1256. The plaintiff pursued a duty of fair representation claim against the union for discontinuing his representation, and the *Del Casal* court agreed the union breached the duty of fair representation. *Id*. at 1259. But the plaintiff decided to continue with the System Board hearings after retaining new non-union counsel of his choosing. *Id*. Because the plaintiff failed to allege the union attorney "could have adduced additional evidence in appellant's favor" beyond that found by his privately retained attorney, his complaints about the integrity of the Board's process based on his legal representation were "mere conjecture and invalid." *Del Casal*, 634 F.2d at 300. Having litigated his position, therefore, the court rejected his wrongful discharge claim that was based on the allegedly defective arbitration process. By contrast, the Plaintiffs here allege they were

effectively shut out of the arbitration, including the selection of the Pilots Committees who participated in the arbitration and the retention of counsel for those committees. *See* MSCompl. ¶¶ 26-36.[10]

Finally, American complains that the Plaintiffs have not set forth the results of the arbitration. *See* AMR's Letter Response at 3-4 [ECF No. 63] (raising concerns regarding the Court's ability to evaluate the results of the interest arbitration); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 163 (2d Cir. 1989) (finding results of arbitration relevant to duty of fair representation claim as court should not have to speculate on the outcome of an arbitration where alleged injury presumes harm from same); *Kavowras v. New York Times Co.*, 328 F.3d 50, 56 (2d Cir. 2003) (noting plaintiff could not have been expected to bring suit before outcome of arbitration and court should not be compelled to adjudicate the same where efficacy of union's representation turned on arbitration outcome) (citing *Ghartey*, 869 F.2d at 163). But it is enough to remove the bar of finality here for Plaintiffs to allege a breach of the duty of fair representation that "seriously undermine[d] the integrity of the arbitral process" and caused harm to the Plaintiffs.[11] *See Hines*, 424 U.S. 567; *see also Kavowras*, 328 F.3d at 53. Of course, such claims are subject to the same strict standards as any other duty of fair representation claims. *See*

---

[10]     Indeed, unlike cases relied upon by American, it is unclear whether Plaintiffs had the right to move to vacate the arbitration award as they were not participants in the proceeding. *See Air Wisconsin Pilots Protection Comm. v. Sanderson*, 909 F.2d 213 (7th Cir. 1990); *see also Musto v. Transp. Workers Union of Am. AFL-CIO*, 818 F. Supp. 2d 621, 640 (E.D.N.Y. 2011) (noting that a "party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding.") (quoting *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 324 (1972)).

[11]     *See* MSCompl. ¶ 36 (alleging that as a result of the proposal adopted by the LOA 12-05 arbitrators, "the majority of former TWA pilots lost their jobs in St. Louis, and because of their lack of seniority, most of them are unable to hold equivalent jobs at any of American's other bases.").

*Williams*, 874 F. Supp. at 716 (evidence must tend to establish severely deficient union

conduct required for breach); *Ash v. U.P.S., Inc.*, 800 F.2d 409, 411 (4th Cir. 1986).[12]

## <u>CONCLUSION</u>

For the reasons stated above, the Court grants the Motion in part, and denies it in

part, dismissing the allegations in ¶ 48 (A)-(D) from the Modified Supplemental

Complaint without prejudice.  The Defendants shall settle an order on three days' notice.

The proposed order must be submitted by filing a notice of the proposed order on the

Case Management/Electronic Case Filing docket, with a copy of the proposed order

attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be

served upon opposing counsel.

Dated: New York, New York
        September 3, 2015

/s/ *Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE

---

[12]        Given the conclusions reached in this decision, it is not necessary for the Court to address the other arguments raised in American's motion, including American's reliance on the *Noerr-Pennington* doctrine.