**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re:                                              Chapter 11

AMR CORPORATION, *et al.*,                          Case No. 11-15463 (SHL)

                 Reorganized Debtors.         (Confirmed)
----------------------------------------------------------------x
JOHN KRAKOWSKI, *et al.*,

                 Plaintiffs,

        v.                                Adv. No. 13-01283 (SHL)

AMERICAN AIRLINES, INC., *et al.*,

                 Defendants.
----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**JACOBSON PRESS & FIELDS P.C.**
*Counsel for Plaintiffs*
168 North Meramec Avenue, Suite 150
Clayton, Missouri 63105
By:    Allen P. Press, Esq.

**O'MELVENY & MYERS LLP**
*Counsel for American Airlines, Inc.*
Times Square Tower
7 Times Square
New York, New York 10036
By:    Mark W. Robertson, Esq.
          Sloane Ackerman, Esq.

       -and-

400 South Hope Street
Los Angeles, California 90071
By:    Robert A. Siegel, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Avenue, NW, Suite 950
Washington, DC 20036
By:     Steven K. Hoffman, Esq.
        Daniel M. Rosenthal, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the Defendants' motions for summary judgment [ECF Nos. 111-1, 114] [1] with respect to the Plaintiffs' modified supplemental class action complaint filed on behalf of the Plaintiffs and all persons similarly situated (the "Complaint") [ECF No. 48].  Plaintiffs John Krakowski, Kevin Horner, and M. Alicia Sikes are former Trans World Airlines ("TWA") pilots that are now employed by American Airlines, Inc. ("American").  The Complaint alleges that the Allied Pilots Association ("APA")—the pilots' union at American—breached its duty of fair representation to the Plaintiffs and that American colluded in that breach.[2]

As part of American's bankruptcy restructuring, the company sought and received authority to reject its then-existing collective bargaining agreement with APA (the "Old CBA"). *See Plaintiffs' Response to American's Statement of Material Facts* ("Resp. to American SMF") ¶ 3 [ECF No. 122].  American subsequently negotiated a new collective bargaining agreement with APA (the "New CBA") that eliminated certain job protections that legacy TWA pilots like the Plaintiffs had held under the Old CBA.  *See* Resp. to American SMF ¶¶ 2-4.  At the same time, American and APA entered into a letter agreement that contemplated an arbitration

---

[1]      Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to this adversary proceeding.

[2]      The Plaintiffs originally brought this action in the United States District Court for the Eastern District of Missouri.  The Missouri District Court transferred the case to this Court on March 6, 2013.  *See Memorandum and Order*, Case No. 4:12-cv-00954-JAR [ECF No. 1].

proceeding to create new job protections for these legacy TWA pilots as an alternative to those lost under the New CBA. *See* Resp. to American SMF ¶¶ 4-6.

The Court has issued two prior decisions in this adversary proceeding granting dismissal of many of the claims asserted by the Plaintiffs against the Defendants. *See Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 536 B.R. 360 (Bankr. S.D.N.Y. 2015); *Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 2014 WL 2508729 (Bankr. S.D.N.Y. Jun. 3, 2014).[3] The Plaintiffs' remaining claims allege breaches of APA's duty of fair representation with respect to the procedures used to conduct the arbitration, and assert that American colluded in those breaches. *See generally Krakowski*, 536 B.R. 360; Compl. ¶¶ 48(E)-(J), 57. For the reasons set forth below, the Court grants the Defendants' motions for summary judgment and denies the Plaintiffs' related motion to amend the Complaint. [ECF No. 134].

## BACKGROUND

### A. The Collective Bargaining Agreement and Establishment of the Arbitration

In 2001, American acquired the assets of TWA. *See* Resp. to American SMF ¶ 1. Shortly thereafter, American and APA executed an agreement entitled "Supplement CC" that integrated the TWA pilots into American's pilot group. *See* Resp. to American SMF ¶ 2. Supplement CC modified American's pilot seniority list to include the former TWA pilots, but stripped these former TWA pilots of much of the seniority earned while at TWA. *See* Resp. to

---

[3]     Today's decision is but one part of an ongoing blizzard of litigation involving these parties. In addition to the two decisions referenced above, the Court in this case has also issued a decision denying the Plaintiffs' request for a stay of the arbitration. *See Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 2015 WL 2414750 (Bankr. S.D.N.Y. May 19, 2015). Moreover, the Court has issued two opinions in another adversary proceeding filed by these same Plaintiffs relating to disputes between the same parties over the alternative job protections to be awarded legacy TWA pilots. *See Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 538 B.R. 213 (Bankr. S.D.N.Y. 2015); *Krakowski v. American Airlines, Inc. (In re AMR Corp.)*, 567 B.R. 247 (Bankr. S.D.N.Y. 2017). Last but not least, these Plaintiffs have filed another case involving the same parties regarding the arbitration on the alternative job protections. *See* Adv. No. 16-01138. This extensive litigation history will become relevant in analyzing certain legal issues below.

American SMF ¶ 2.  But it also constructed a "protective fence" at American's St. Louis pilot base, which created a minimum number of captain positions for legacy TWA pilots and provided them with preferential bidding for first officer positions.  *See* Resp. to American SMF ¶ 2.

In November 2011, American filed for protection under Chapter 11 of the Bankruptcy Code.  *See* Resp. to American SMF ¶ 3.  As part of its reorganization, American sought and obtained the Court's permission to abrogate its obligations under the Old CBA, including Supplement CC, pursuant to Section 1113 of the Bankruptcy Code.  *See* Resp. to American SMF ¶ 3; *In re AMR Corp.*, 477 B.R. 384, 393-95 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 478 B.R. 599, 601-02 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 2012 WL 3834798 (Bankr. S.D.N.Y. Sept. 5, 2012), *aff'd*, 523 B.R. 415 (S.D.N.Y. 2014), *aff'd*, 622 Fed. App'x 64 (2d Cir. 2015).  In December 2012, American and APA came to an agreement on the New CBA, which included a side letter of agreement numbered 12-05 ("LOA 12-05").  *See* Resp. to American SMF ¶¶ 4-5. Later that month, the Court entered an order approving the New CBA.  *See* Resp. to American SMF ¶ 10.

The New CBA, including LOA 12-05, was voted on and ratified by APA membership, including the legacy TWA pilots.  *See* Resp. to American SMF ¶ 8.  Approximately 81% of the participating pilots at American's St. Louis domicile voted in favor of the New CBA.  *See* Resp. to American SMF ¶ 9.  Significantly, about 85% of the legacy TWA pilots at American were APA members in St. Louis at the time of the vote.  *See* Resp. to American SMF ¶ 9.

LOA 12-05 provided that American "will have the right, in its sole discretion, to decide whether to close the existing STL pilot base," and that "a dispute resolution procedure is necessary to determine what alternative contractual rights should be provided to TWA Pilots as a result of the loss of flying opportunities due to termination of Supplement CC and the closing of

the STL base."[4]  Resp. to American SMF ¶ 5 (quoting Am. Ex. A, LOA 12-05 at 1 [ECF No.

117-1]).  With respect to the dispute resolution process, LOA 12-05 stated that the parties would

"engage in final and binding interest arbitration" in front of a panel "consist[ing] of three neutral

arbitrators who are members of the National Academy of Arbitrators with Richard Bloch as the

principal neutral."  Resp. to American SMF ¶ 6 (quoting Am. Ex. A, LOA 12-05 at 1, 2 [ECF

No. 117-1]).  Under LOA 12-05, the arbitrators were to "decide what non-economic conditions

should be provided to TWA Pilots," but "[i]n no event shall the arbitrators have authority to

modify the Pilots' System Seniority List . . . or impose material costs beyond training costs on

the Company."  Resp. to American SMF ¶ 7 (quoting Am. Ex. A, LOA 12-05 at 2 [ECF No.

117-1]).

During the relevant time period, the APA Board was composed of two members from

each of several geographic pilot "bases," including the St. Louis base, who were elected by APA

members at their respective bases and served as advocates for those pilots.  *See* Resp. to APA

SMF ¶¶ 9-10.  During the period relevant to this case, nearly all of APA's members at the St.

Louis base—at least 93%—were legacy TWA pilots.  *See* Resp. to APA SMF ¶ 11.  In 2012, the

APA Board members that were elected from the St. Louis base were Captain Keith Bounds and

Captain Douglas Gabel, both of whom were legacy TWA pilots.  *See* Resp. to APA SMF ¶ 12.

During 2012, Captain Gabel reached his term limit as an APA Board member and Captain

---

[4]      Due to American's desire to close the St. Louis base, and the difficult and politically charged nature of the
debate that had surrounded Supplement CC, APA's Board of Directors (the "APA Board") determined that
American and APA should let three neutral arbitrators decide the protections for the affected pilots if Supplement
CC were eliminated.  *See Plaintiffs' Response to APA's Statement of Material Facts* ("Resp. to APA SMF") ¶ 5
[ECF No. 124].  The APA Board approved a motion to that effect in February 2012.  *See* Resp. to APA SMF ¶ 5.
APA posted a public message to the pilots explaining the motion.  *See* Resp. to APA SMF ¶ 7.  American and APA
ultimately agreed to resolve the issue through the process described in the February 2012 motion, and that
agreement became LOA 12-05.  *See* Resp. to APA SMF ¶ 8.

Marcus Spiegel, a legacy TWA pilot, was elected by the St. Louis base to replace Captain Gabel. *See* Resp. to APA SMF ¶ 17.

APA attorney Edgar James, Esq. negotiated the language of LOA 12-05 on behalf of APA. *See* Resp. to APA SMF ¶ 18. In doing so, he consulted frequently with Captains Gabel, Bounds and Spiegel from the St. Louis base. *See* Resp. to APA SMF ¶ 19. Indeed, Captain Gabel "was involved in the formation of LOA 12-05 from the early drafts in February 2012 through the final agreement." *See* Resp. to APA SMF ¶ 19 (quoting Pl. Ex. 4, Decl. of Douglas J. Gabel ¶ 13 [ECF No. 97-4]). While Captains Gabel and Bounds opposed the limitation on changes to seniority contained in LOA 12-05, it is undisputed that they approved all of the other language of LOA 12-05, including the language identifying Arbitrator Bloch as the principal arbitrator. *See* Resp. to APA SMF ¶¶ 20, 39-40; Resp. to American SMF ¶ 8. Additionally, American and APA both agreed that Arbitrator Bloch should serve as the principal arbitrator because he was a prominent Railway Labor Act arbitrator that was familiar to airline industry practitioners. *See* Resp. to American SMF ¶ 6.

In January 2013, American and APA entered into a protocol agreement regarding the LOA 12-05 arbitration (the "Protocol Agreement"). *See* Resp. to American SMF ¶ 11. The Protocol Agreement stated that the LOA 12-05 arbitration would "provide for party status and the hearings and for substantive presentations by: (1) American Airlines, Inc.; (2) a representative committee of AA Pilots . . . and (3) a representative committee of TWA Pilots . . . ." Resp. to American SMF ¶ 14 (quoting Am. Ex. B, Protocol Agreement ¶ 1 [ECF No. 117-2]).

The representative committee of legacy AA Pilots (the "AA Pilots Committee") was chaired by Captain Mark Stephens and also included Captain Michael Mellerski, Captain James Eaton, and Captain Drew Engelke. *See* Resp. to American SMF ¶ 15. Captain Stephens chose

the other members of the AA Pilots Committee. *See* Resp. to APA SMF ¶ 34. The representative committee of legacy TWA Pilots (the "TWA Pilots Committee") was chaired by Captain Gabel and also included Captain Dave Williams, Captain John Swanson, First Officer Cary Bouchard, and First Officer Thomas Duncan, all of whom were legacy TWA pilots. *See* Resp. to American SMF ¶ 16; Resp. to APA SMF ¶ 25. Captain Gabel was chosen as the chair of the TWA Pilots Committee by Captains Bounds and Spiegel, the two legacy TWA pilots that were then serving as the elected representatives from the St. Louis base. *See* Resp. to APA SMF ¶ 24. Captain Gabel chose the other members of the TWA Pilots Committee. *See* Resp. to APA SMF ¶ 25.

American was not consulted or otherwise involved in selecting the members of either pilot committee or their committee chairs, and was unaware of how committee members were chosen. *See* Resp. to American SMF ¶ 17. Thus, American was not aware of the committee members and chairs that were chosen until after the decisions had been made. *See* Resp. to American SMF ¶ 17. APA budgeted $100,000 for each of the pilot committees but, as of October 2013, it had reimbursed the TWA Pilots Committee fees and expenses in the amount of $532,971 and the AA Pilots Committee in the amount of $336,657. *See* Resp. to APA SMF ¶ 102.

The Protocol Agreement further provided that in addition to Arbitrator Bloch, the members of the arbitration panel would include Arbitrators Stephen Goldberg and Ira Jaffe. *See* Resp. to American SMF ¶ 12. Captain Gabel suggested the appointment of Arbitrators Goldberg and Jaffe as the remaining two arbitrators and APA accepted the suggestion. *See* Resp. to APA SMF ¶ 51; Resp. to American SMF ¶ 12. American subsequently accepted Arbitrators Goldberg

and Jaffe because they were nationally prominent arbitrators that were familiar to airline industry

practitioners.  *See* Resp. to American SMF ¶ 12.

## B.   <u>The Arbitration Process</u>

During the course of the arbitration, the TWA Pilots Committee, the AA Pilots

Committee and American were each represented by separate counsel.  *See* Resp. to American

SMF ¶ 19.  The AA Pilots Committee was represented by Wesley Kennedy, Esq., while the

TWA Pilots Committee was represented by John O'B. Clarke, Esq.  *See* Resp. to American SMF

¶ 19.  American chose its own counsel, but was not consulted or otherwise involved in selecting

counsel for the pilot committees, and was unaware of how the committees' counsel were

selected.  *See* Resp. to American SMF ¶¶ 19-20.  Thus, American was also unaware of who

represented the pilot committees until after the decisions had been made.  *See* Resp. to American

SMF ¶ 20.  At some point during the arbitration, the TWA Pilots Committee claimed that Mr.

Kennedy had a conflict of interest in representing the AA Pilots Committee, but American was

not aware of this allegation until after the arbitration concluded.  *See* Resp. to American SMF ¶

21.

Prior to the commencement of the LOA 12-05 arbitration, APA emailed all pilots about

the arbitration process and gave them contact information for the TWA Pilots Committee and the

AA Pilots Committee.  *See* Resp. to APA SMF ¶ 79.  APA also posted a document informing

pilots that they had a right to participate individually in the LOA 12-05 proceeding.  *See* Resp.

to APA SMF ¶ 79.

The LOA 12-05 arbitration began with a procedural hearing on April 2, 2013, followed

by several days of evidentiary hearings in April and May 2013, and closing arguments in June

2013.  *See* Resp. to APA SMF ¶ 80.  Prior to the arbitration commencing, the TWA Pilots

Committee submitted a pre-hearing brief of approximately 40 pages. *See* Resp. to American

SMF ¶ 24. During the arbitration, the TWA Pilots Committee presented five witnesses and

cross-examined all witnesses called by the AA Pilots Committee and American. *See* Resp. to

American SMF ¶ 24. The TWA Pilots Committee also introduced dozens of exhibits, in addition

to the joint exhibits that were submitted by the parties. *See* Resp. to American SMF ¶ 24.

Subsequent to the arbitration, the TWA Pilots Committee submitted a 44-page brief in support of

its proposal, as well as a 29-page reply brief. *See* Resp. to American SMF ¶ 24.

The Plaintiffs and all other legacy TWA pilots had access to all materials from the

arbitration, including hearing transcripts, through a website on which the materials were

promptly posted. *See* Resp. to APA SMF ¶ 87. All pilots were also allowed to attend the

hearings, and Plaintiffs Sikes and Horner did so. *See* Resp. to APA SMF ¶ 88. Indeed, Plaintiff

Krakowski read transcripts of the hearings and both Plaintiffs Krakowski and Horner reviewed

the briefs submitted to the arbitrators. *See* Resp. to APA SMF ¶ 88. Additionally, all affected

pilots, including all legacy TWA pilots, were allowed to present written submissions and make

oral presentations to Arbitrator Bloch in Washington, D.C. and St. Louis on May 14-15, 2013,

regarding the impact on them from the loss of Supplement CC and the St. Louis base. *See* Resp.

to APA SMF ¶¶ 93, 96; Resp. to American SMF ¶ 25. In all, the arbitrators received 270 written

pilot submissions, and approximately 43 of the 55 pilots that made oral presentations were

legacy TWA pilots. *See* Resp. to American SMF ¶ 25. This included Plaintiff Sikes, who

endorsed the proposal made by the TWA Pilots Committee, and Keith Bounds, a St. Louis

representative who presented a statement on behalf of 120 legacy TWA pilots. *See* Resp. to

American SMF ¶ 25.

C. **Arguments at Arbitration and Arbitrators' Rulings**

The parties focus on three substantive issues that are relevant to the legal challenges raised regarding the arbitration.[5]  First, the TWA Pilots Committee argued that the arbitrators should seek to "replicate" Supplement CC's protections, relying on a statement previously made by APA attorney Edgar James in court proceedings and on testimony by Captain Gabel that the intent of LOA 12-05 was to "replicate" Supplement CC.  *See* Resp. to APA SMF ¶¶ 104, 106-07.  APA did not take a position on the "replicate" issue.  *See* Resp. to APA SMF ¶ 108.  Though opposed to the "replicate" standard, the AA Pilots Committee argued that its proposal best satisfied that standard.  *See* Resp. to APA SMF ¶ 110.  American objected to the TWA Pilots Committee's advocacy of a "replicate" standard, arguing that it contravened the terms of LOA 12-05.  *See* Resp. to American SMF ¶ 28.  The arbitrators ultimately agreed, concluding that "replicate" was not the proper standard:

> the Panel does not seek to re-establish, reproduce or replicate Supplement CC or its customized preferences.  Given the termination of that document and the impending St. Louis base closing, that effort would be both fruitless and contrary to the manifested intent of LOA 12-05, which is to determine 'alternative' rights and to 'substitute' for the lost preferential flying opportunities.

Resp. to APA SMF ¶ 109 (quoting APA Ex. 1-F, LOA 12-05 Merits Opinion at 5 [ECF No. 92-9]).

Second, the AA Pilots Committee proposed "pay protection" for a certain number of legacy TWA pilots.  *See* Resp. to APA SMF ¶ 112.  Under this proposal, if fewer than 340 legacy TWA pilots were able to acquire captain positions after the closing of the St. Louis base, American would offer "pay protection" to the number of legacy TWA pilots that equaled the

---

[5]        The Plaintiffs' duty of fair representation challenge relates to how the arbitration was conducted and not what the arbitrators ultimately awarded.  Accordingly, this decision focuses on facts that relate to the process of the arbitration itself, not those that relate solely to the substance of the arbitrators' ultimate award.

difference between 340 and the number of legacy TWA pilots then serving as captains. *See* Resp. to APA SMF ¶ 112. American would in effect pay 340 legacy TWA pilots as if they were captains, whether or not such individuals were actually able to obtain captain positions. *See* Resp. to APA SMF ¶ 112. American argued that this proposal was outside the arbitrators' jurisdiction because LOA 12-05 permitted the arbitrators only to award "non-economic conditions," and not to increase costs for American. *See* Resp. to APA SMF ¶ 113. APA did not take a position on the issue because, as explained by Edgar James, "[i]t's the company's role to object to additional costs. It's not the union role." Resp. to APA SMF ¶ 115 (quoting APA Ex. 15, James Depo. Tr. 103:19-20, June 14, 2016 [ECF No. 111-23]).[6] While the AA Pilots Committee responded that the baseline for measuring economic costs should be the status quo as of the LOA 12-05 arbitration, *see* Resp. to APA SMF ¶ 114, the arbitrators indicated that they agreed with American's position. *See* Resp. to APA SMF ¶ 116.[7] The AA Pilots Committee subsequently revised its proposal, including a more limited pay protection proposal. *See* Resp. to APA SMF ¶ 117; APA Ex. 9-L, Closing Brief of AA Pilots Committee at 11, 68 [ECF No. 111-16].

Third, the TWA Pilots Committee made a proposal regarding how legacy TWA Pilots were permitted to bid on schedules. As described by the arbitrators, the TWA Pilots

---

[6]    The Plaintiffs deny this statement of fact because they assert the pay protection proposal was made by the AA Pilots Committee. But for reasons discussed more fully below, there is no evidence that APA was responsible for the positions taken by the AA Pilots Committee (or the TWA Pilots Committee) during the arbitration.

[7]    *See also* APA Ex. 9-H, LOA 12-05 Arbitrator Panel Suggestions Regarding Post-Hearing Submissions at 2 [ECF No. 111-12] ("In reviewing the submissions thus far, we are concerned that the APA AA Pilots' Committee proposal, which includes pay protection provisions for certain narrow-body captain positions and certain small-wide body captain positions amounts to an 'economic condition,' the imposition of which is foreclosed to this Panel by agreement of the parties to LOA 12-05. For similar reasons, we are troubled by that portion of the APA AA Pilots' Committee Proposal suggesting that the pay protection proposal is not material (perhaps not even economic) because, on balance, it is claimed, the Company will save more by closing St. Louis as a pilot domicile than it will expend by means of pay protection. We are not convinced either that the premises [sic] underlying the analysis are necessarily correct or, more importantly, that without regard to arguments concerning calculations, these are non-economic conditions or material costs beyond those associated with training.").

Committee's initial proposal would have permitted legacy TWA pilots bidding for schedules to
bid based on seniority determined by "their TWA date of hire, while AA pilots against whom
they bid would use their AA date of hire," or, in the alternative, employ a "percentile bidding
methodology to accomplish the same goal."  Resp. to APA SMF ¶ 118 (quoting APA Ex. 9-H,
LOA 12-05 Arbitrator Panel Suggestions Regarding Post-Hearing Submissions at 3 [ECF No.
111-12]).  In support of this argument, the TWA Pilots Committee presented evidence regarding
the intent of LOA 12-05, including testimony regarding Captain Gabel's conversations with Mr.
James.  *See* Resp. to APA SMF ¶ 121.  American opposed this proposal, arguing that by
imposing a date of hire bidding methodology, the proposal did not provide "preferential flying
rights" as required by LOA 12-05 but instead substituted a new seniority list in violation of the
prohibition on modifications to the seniority list.  *See* Resp. to APA SMF ¶ 120.  The TWA
Pilots Committee disagreed, contending that its proposal provided only "preferential flying
rights," that the bidding rules would only apply "inside . . . your equipment group," and that
"[t]he relative order among TWA pilots [was] the same relative order as TWA pilots stand [on]
the system seniority list."  Resp. to APA SMF ¶ 120 (quoting APA Ex. 9-A, LOA 12-05
Arbitration Tr. 780:2, 777:20-22, Apr. 2, 2013 [ECF No. 111-5]).

　　　　After hearing these arguments, the arbitrators concluded that the TWA Pilots Committee
proposal regarding bidding violated LOA 12-05 because it did not constitute "preferential flying
rights" but rather "effectively modif[ied] the position of the TWA pilots on the system seniority
list (at least for some purposes)."  Resp. to APA SMF ¶ 122 (quoting APA Ex. 9-H, LOA 12-05
Arbitrator Panel Suggestions Regarding Post-Hearing Submissions at 3 [ECF No. 111-12]).  Like
the AA Pilots Committee did after its proposal was deemed outside the scope of the arbitrators'
authority, the TWA Pilots Committee subsequently changed its proposal "to advocate a path to

12

an award that is clearly within this Board's jurisdiction to grant." *See* Resp. to APA SMF ¶ 123

(quoting APA Ex. 9-C, Post-Hearing Brief of the TWA Pilots Committee at 27 [ECF No. 111-

7]).  These changes included a shift away from its date of hire or percentile bidding proposals

and towards a "protective fences" approach for the flying assigned to the legacy TWA pilots.

*See* APA Ex. 9-C, Post-Hearing Brief of the TWA Pilots Committee at 27-28 [ECF No. 111-7].

In addition to these three substantive areas, the TWA Pilots Committee proposal also

contained two procedural provisions for future arbitrations.  *See* Resp. to APA SMF ¶ 124.  First,

the TWA Pilots Committee asked the arbitrators to "[e]stablish a multiparty adjustment board . . .

in which TWA and preacquisition AA pilots have equal representation to raise and resolve

disputes arising out of the application [and] interpretation of the Revised Supplement CC." *See*

Resp. to APA SMF ¶ 125 (quoting APA Ex. 1-H, APA Response to Proposal at 2 [ECF No. 92-

11]).  APA considered that proposal to be outside the panel's jurisdiction because LOA 12-05

already specified a dispute resolution mechanism, providing Bloch with continuing jurisdiction.

*See* Resp. to APA SMF ¶ 126.  Second, the TWA Pilots Committee asked that the TWA pilots be

granted "separate party status . . . in any AA/US Airways . . . seniority integration negotiation

and/or arbitration in which they may propose an integration of their seniority by TWA [date of

hire]."  Resp. to APA SMF ¶ 127 (quoting APA Ex. 1-H, APA Response to Proposal at 2 [ECF

No. 92-11]).  APA responded that this second procedural proposal was outside the panel's

jurisdiction because, among other reasons, it contemplated changing the legacy TWA pilots'

seniority as compared to other American Airlines pilots, violating the provision of LOA 12-05

barring such change.  *See* Resp. to APA SMF ¶ 128.  The TWA Pilots Committee submitted a

response to APA's brief, arguing that it should be stricken by the arbitrators.  *See* Resp. to APA

SMF ¶ 129.  The panel did not accept APA's jurisdictional arguments, but also declined to adopt either of the TWA Pilots Committee's procedural proposals.  *See* Resp. to APA SMF ¶ 130.

After the arbitrators issued their merits award in July 2013, American and APA drafted contractual language to implement the award, subject to approval by the arbitrators.  *See* Resp. to APA SMF ¶ 131-33.  The TWA Pilots Committee participated in the development of this contractual language.  *See* Resp. to APA SMF ¶ 134.  The parties were unable to agree on two issues regarding the contractual language, and the TWA Pilots Committee then submitted a brief to the arbitrators regarding those issues.  *See* Resp. to APA SMF ¶ 135.  The AA Pilots Committee opposed the TWA Pilots Committee's positions.  *See* Resp. to APA SMF ¶ 135.  In September 2013, the panel issued an opinion resolving the remaining issues regarding the contractual language.  *See* Resp. to APA SMF ¶ 136.

During the arbitration, American advanced its own position on the alternative contractual rights that should be provided to the legacy TWA pilots as it was entitled to under the Protocol Agreement.  *See* Resp. to American SMF ¶ 26.  There is no evidence that American contributed to the positions of the pilot committees in the arbitration.  *See* Resp. to American SMF ¶ 27.  Nor is there evidence that American supported the positions of either of the pilot committees as to the substitute job protections that should be awarded to the legacy TWA pilots by the arbitrators.  *See* Resp. to American SMF ¶ 28.[8]  Aside from its three-page post-hearing brief regarding the TWA Pilots Committee procedural proposals, there is no evidence that APA took any position

---

[8]    Indeed, American objected to each pilot committees' proposal, arguing that they both contravened the terms of LOA 12-05.  *See* Resp. to American SMF ¶ 28.  American argued that the proposal made by the AA Pilots Committee would improperly require American to downgrade captains to first officer positions and pay them at captain rates—an economic condition that would impose excessive costs on American in violation of LOA 12-05, and contrary to the purpose of closing the St. Louis base.  *See* Resp. to American SMF ¶ 29.  With respect to the proposal made by the TWA Pilots Committee, American argued that it improperly substituted a reconfigured seniority list, despite the fact that LOA 12-05 prohibited the arbitrators from modifying the seniority list.  *See* Resp. to American SMF ¶ 30.

on the merits of the parties' substantive proposals or any other substantive issue in the

arbitration.  *See* Resp. to American SMF ¶ 31.  American did not contribute to the APA post-

hearing brief on the procedural issues and was unaware of its content until after it was filed.  *See*

Resp. to American SMF ¶ 31.[9]

## DISCUSSION

### A.  Legal Standards

#### 1.  Breach of Fiduciary Duty

"A union has a duty to represent fairly all employees subject to the collective bargaining

agreement."  *Vaughn v. Air Line Pilots Ass'n Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (internal

citations and quotations omitted).  This duty of fair representation requires that a union represent

employees adequately, honestly, and in good faith.  *See Krakowski v. American Airlines, Inc., (In

re AMR Corp.)*, 2014 WL 2508729, at *3 (Bankr. S.D.N.Y. June 3, 2014) (citing *Air Line Pilots

Ass'n, Intern. v. O'Neill,* 499 U.S. 65, 75 (1991)).  But "Congress did not intend judicial review

of a union's performance to permit the court to substitute its own view of the proper bargain for

that reached by the union."  *O'Neill*, 499 U.S. at 78.  Thus, "[a]ny substantive examination of a

union's performance . . . must be highly deferential, recognizing the wide latitude that

negotiators need for the effective performance of their bargaining responsibilities."  *Id*.  To prove

that a union breached its duty of fair representation, a plaintiff must show that the union's actions

or inactions were arbitrary, discriminatory, or in bad faith.  *Vaughn*, 604 F.3d at 709.  Each of

these three concepts has its own standard.

---

[9]     Most of the sentences in this paragraph are disputed by the Plaintiffs in their response to APA's statement of material facts.  But for reasons further discussed below, the Court finds that the Plaintiffs have no basis to dispute these facts.

First, a union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Vaughn*, 604 F.3d at 709 (quoting *O'Neill,* 499 U.S. at 67). Courts must review a union's actions "in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." *O'Neill*, 499 U.S. at 78. While a union's decision may in hindsight "appear to the losing employee to have been erroneous[,] . . . tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Barr v. United Parcel Serv., Inc.,* 868 F.2d 36, 43 (2d Cir. 1989).

Second, a union's actions are considered discriminatory if they were "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec., Ry., & Motor Coach Employees of Am. v. Lockridge,* 403 U.S. 274, 301 (1971); *see also Nikci v. Quality Bldg. Services,* 995 F. Supp. 2d 240, 248 n.4 (S.D.N.Y. 2014) (dismissing complaint for failure to allege the *Lockridge* factors). "There is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives." *Vaughn,* 604 F.3d at 712. For instance, the Supreme Court held in *O'Neill* that "discrimination" "in the form of granting one union member seniority over another similarly situated member did not *per se* violate a union's duty of fair representation." *Krakowski*, 2014 WL 2508729, at *3 (citing *O'Neill,* 499 U.S. at 81). Rather, such treatment is improper "where the union prefers or disparages the union members based upon characteristics that are irrelevant to legitimate union objectives." *Krakowski*, 2014 WL 2508729, at *3 (citing *Jones v. Trans World Airlines,* 495 F.2d 790, 797–98 (2d Cir. 1974) (union membership alone is not proper ground for union to determine seniority); *Wolf Trap Foundation for the Performing Arts,* 287 N.L.R.B. 1040, 1059

(1988) (finding discrimination where union singled out an employee only because she was female and a non-union member)).

Third, a union has acted in bad faith, where it "engaged in fraud, dishonesty, or other intentionally misleading conduct with an improper intent, purpose, or motive." *Krakowski*, 2014 WL 2508729, at *4 (citing *Vaughn,* 604 F.3d at 709–10).

2. <u>Causation</u>

To prove a breach of duty of fair representation, plaintiffs must also "demonstrate a causal connection between the union's wrongful conduct and their injuries." *Vaughn,* 604 F.3d at 709 (internal citations and quotations omitted). In cases alleging a breach of duty of fair representation claim relating to an arbitration award, causation may be assessed in the summary judgment context. *See Mullen v. Bevona*, 1999 WL 974023, at *6 (S.D.N.Y. Oct. 26, 1999) (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976)); *see also Alen v. U.S. Airways, Inc.*, 526 F. App'x 89, 91 (2d Cir. 2013) ("A union breaches its duty to fairly represent its members if its conduct is arbitrary, discriminatory, or in bad faith, and if there is a causal connection between the union's wrongful conduct and their injuries.") (internal citations and quotations omitted). This is because, to succeed on such a claim, a plaintiff must show "that defendant's conduct 'seriously undermined the arbitral process.'" *Mullen*, 1999 WL 974023, at *6 (quoting *Barr*, 868 F.2d at 43). The plaintiff must further establish that "'the unsuccessful result was due to the union's wrongful conduct.'" *Id*. at *6 (quoting *Young v. United States Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990)).

> [I]t is insufficient to show that the outcome *might* have been different if defendant's conduct had been different. To demonstrate that defendant 'seriously undermined the arbitral process,' the plaintiff must show more than a remote possibility that the outcome would have differed if the defendant had not breached its duty of fair representation.

17

*Id*. (emphasis in original).

The Plaintiffs argue that causation should not be evaluated on summary judgment, relying on *Gorwin v. Local 282, I.B.T.*, 1997 WL 151043 (S.D.N.Y. April 1, 1997). But the Court disagrees. The court in *Gorwin* actually assessed causation in the summary judgment context. *See id.* at *11 (The Court . . . finds that Gorwin has not presented any evidence that the Union's misrepresentation of its progress could have contributed to the erroneous outcome of the arbitration."). While the court ultimately denied summary judgment on the claim in *Gorwin*, it was only because the court concluded that there were disputed factual issues in the case on the related legal questions, including causation. *See id.*

The Plaintiffs also argue for a different—and higher—standard for evaluating causation than set forth above. The Plaintiffs contend that causation is shown only when "there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the proceedings." *Plaintiffs' Memo. in Opp. to APA Renewed Mot. for Summ. J.* [ECF No. 123] ("Pl. Opp. to APA SJM") at 26 (quoting *Hines*, 424 U.S. at 568; citing *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 163 (2d Cir. 1989); *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 251 (E.D.N.Y. 2015); *Tomney v. Int'l Ctr. For the Disabled*, 357 F. Supp. 2d 721, 736 (S.D.N.Y. 2005). But some courts citing this language have also stated that "unless there is some causal connection between the breach and the alleged erroneous outcome, then [the plaintiff] has no action." *Phillips v. Lenox Hill Hospital*, 673 F. Supp. 1207, 1214 (S.D.N.Y. 1987); *see also Bacchus*, 137 F. Supp. 3d at 251 ("'[P]laintiff cannot prevail on [duty of fair representation] claim unless she establishes that further action on the Union's part would have resulted in a favorable outcome.'") (quoting *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d

552, 563 (S.D.N.Y. 2005)).  In fact, the case law on causation for a duty of fair representation

claim is not extensive in this jurisdiction nor is it consistent as to the standard to be employed.

In any event, the Court has no reason to further parse the standard given that—for the

reasons discussed below—the Court finds that the Plaintiffs have failed to put forward evidence

demonstrating a causal connection for their various claims under either formula of the causation

standard.  *See Hellstrom*, 46 Fed. App'x at 654 (quoting *Celotex*, 477 U.S. at 325) (stating that

when the issue is one for which the nonmoving party bears the ultimate burden of proof at trial,

the burden on the party moving for summary judgment is to "demonstrate 'that there is an

absence of evidence to support the nonmoving party's case.'").  APA raised numerous causation-

related issues with respect to the Plaintiffs' arguments about the arbitration process—specifically

regarding the selection of arbitrators, committees, and counsel—for which the Plaintiffs do not

offer evidence (or even an argument) in response.  *See, e.g.*, *Memo. in Support of APA Renewed

Mot. for Summ. J.* [ECF No. 111-1] at 15-17, 20, 22, 24-28, 31.  While these circumstances are

discussed individually below, the Court notes that the Plaintiffs only affirmatively address

causation with respect to their arguments on the lack of a "unified position" and "replicate"

issues.  *See* Pl. Opp. to APA SJM at 27.  But, as discussed below, APA's motion is granted on

these issues for other reasons beyond causation.

3.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a) (made

applicable to the adversary proceeding by Fed. R. Bankr. P. 7056).  A material fact is one that

"might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotations omitted).

"The moving party bears the initial burden of 'informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 Fed. App'x 651, 654 (2d Cir. 2002) (quoting *Celotex*, 477 U.S. at 322). When the issue is one for which the nonmoving party bears the ultimate burden of proof at trial, the burden on the party moving for summary judgment is to "demonstrate 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325). "'It is ordinarily sufficient for the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim. . . . .'" *Netherlands Ins. Co. v. United Specialty Ins. Co.*, 276 F. Supp. 3d 94, 105 (S.D.N.Y. 2017) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). This does not, however, "absolve the movant of the obligation, articulated in *Celotex*, to "'identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 117 n.5 (2d Cir. 2017) (quoting *Celotex*, 477 U.S. at 323).

Once this burden is met, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Hellstrom*, 46 Fed. App'x at 654 (citing *Celotex*, 477 U.S. at 322). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But where "reasonable minds could not differ as to the import of

the evidence, then summary judgment is proper." *Hellstrom*, 46 Fed. App'x at 654 (citing

*Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)).

The court should "resolve all ambiguities and draw all inferences in favor of [the] party

against whom summary judgment is sought." *Hellstrom*, 46 Fed. App'x at 654 (internal citations

omitted).  But a non-movant cannot defeat summary judgment merely by raising "a

'metaphysical doubt' concerning the facts" or by simply offering "conjecture or surmise." *Id*.

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Moreover,

the "nonmoving party's opposition may not rest on mere allegations or denials of the moving

party's pleading, but 'must set forth specific facts showing that there is a genuine issue for

trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)).

### i. *Facts Disputed by These Plaintiffs*

In applying these summary judgment principles here, the Court notes that the Plaintiffs

have broadly denied most facts that the Defendants contend are undisputed regarding the

arbitration.  These include facts about the most basic questions, such as the positions taken by the

parties in the arbitration and who chose the committee members, the arbitrators, and counsel.

But an examination of the record demonstrates that the Plaintiffs have not provided a sufficient

basis for these sweeping denials and, therefore, the Court considers many of the facts the

Plaintiffs oppose to be, in fact, undisputed.

The Plaintiffs offer two grounds for disputing these facts, neither of which has a basis in

law or fact.

First, the Plaintiffs contend that the AA Pilots Committee—and in some circumstances

the TWA Pilots Committee—were mere creatures of APA, and therefore all actions taken by

either committee were under the direction of and should be imputed to APA.  However, as the

undisputed facts in the record establish—and as will be discussed further below—APA took a

neutral position in the arbitration and allowed the two pilot committees to make their own

arguments before the arbitrators about the substitute protections that should be afforded to the

legacy TWA pilots.  *See also* Protocol Agreement ¶ 1 ("APA participation as a party in the

Interest Arbitration shall not be for the purposes of advocating a substantive position but to

facilitate an orderly process and resolution of the dispute" and that "[w]hile AA and APA are the

parties to this Agreement, the Interest Arbitration shall provide for party status and the hearings

and for substantive presentations by: (1) American Airlines, Inc.; (2) a representative committee

of AA Pilots . . . and (3) a representative committee of TWA pilots . . . .").  The Plaintiffs

provide no evidence to support their assertions that APA in some way controlled or directed the

decisions made by the pilot committees.  Indeed, most of the Plaintiffs' denials of the

Defendants' proposed undisputed facts are thinly disguised legal argument relating to their

position that it was inappropriate for APA to allow two pilots committees to participate in the

arbitration rather than having APA put forward a "unified position" during the arbitration.[10]

---

[10]      Thus, the Plaintiffs deny numerous facts based on their general view that the AA Pilots Committee and the
TWA Pilots Committee were somehow simply carrying out APA's bidding.  *See, e.g.,* Resp. to APA SMF ¶ 61
(Plaintiffs deny fact that the TWA Pilots Committee chose Mr. Clarke as their counsel "with no influence
whatsoever from APA" because Plaintiffs assert that "the TWA Pilots Committee was formed by APA as an ad hoc
of itself, and given 'party status' to the LOA 12-05 arbitration between APA and American."); Resp. to APA SMF ¶
81 (Plaintiffs admit fact that that arbitrators stated that APA delegated its advocacy position to pilot committees and
took no position on the substantive positions submitted by the committees, but deny the truth of those statements
because Plaintiffs assert that APA did not and could not outsource its duty of representation and established the
committees of itself to present evidence and argument during the arbitration); Resp. to APA SMF ¶ 82 (Plaintiffs
admit fact that APA's president informed the union's board members that APA was to remain neutral throughout
process, but deny the truth of that statement because Plaintiffs assert that APA did not and could not outsource its
duty of representation and established the committees of itself to present evidence and argument during the
arbitration); Resp. to APA SMF ¶ 83 (Plaintiffs admit fact that stated role of TWA Pilots Committee in arbitration
was to further the interests of the TWA pilot group, but deny that was its true role because Plaintiffs assert that APA
established the committee structure to create potential defense in this case); Resp. to APA SMF ¶ 84 (Plaintiffs deny
fact that TWA Pilots Committee carried out its role without interference from APA or American because "American
and APA's AA Pilots Committee" interfered with the TWA Pilot Committee throughout the arbitration and because
during the arbitration American and the AA Pilots Committee objected to the TWA Pilots Committee proposal as a
de facto seniority adjustment and the TWA Pilots Committee's replicate argument); Resp. to APA SMF ¶ 85
(Plaintiffs deny fact that the TWA Pilots Committee had the opportunity to present its views without interference
from APA or American for same reasons); Resp. to APA SMF ¶ 108 (Plaintiffs deny fact that APA did not take a

Second, the Plaintiffs deny various facts based on their contention that American was supporting APA. The Plaintiffs point out that the positions taken by American were similar to those taken by the AA Pilots Committee, specifically the objections made by American to arguments made by the TWA Pilots Committee during the arbitration relating to (1) the "replicate" issue, and (2) whether the TWA Pilots Committee's proposal was a de facto seniority adjustment for the legacy TWA pilots. *See* Resp. to American SMF ¶ 27.[11] But there is no evidence to support that the positions taken by American during the arbitration should be attributed to another party or that American somehow interfered with the TWA Pilots Committee ability to present its case. Rather, the undisputed facts—discussed more fully below— demonstrate that APA remained neutral during the arbitration process regarding the substitute job protections to be awarded, and American simply took its own position on the issues, which it was allowed to do by right under the Protocol Agreement. *See* Resp. to American SMF ¶ 26 (noting that in accordance with the Protocol Agreement, American may advance its own position regarding the alternative contractual rights that should be provided to the legacy TWA pilots).[12]

---

position in the arbitration on the replicate issue for same reasons); Resp. to APA SMF ¶ 115 (Plaintiffs deny fact that APA did not take position on "non-economic issue' during arbitration because Plaintiffs assert that the pay protection proposal was made by "its Ad Hoc AA Pilots Committee."); Resp. to APA SMF ¶ 135 (Plaintiffs deny fact that TWA Pilots Committee submitted brief to arbitrators regarding contractual language "without interference from APA or American" because Plaintiffs assert that "APA's Ad Hoc American Pilot Committee opposed the TWA Pilot Committee's position.").

[11] Thus, the Plaintiffs deny numerous facts based on their general view that American interfered with the TWA Pilots Committee by taking certain positions during the arbitration, some of which also happened to overlap with the positions taken by the AA Pilots Committee. *See* Resp. to American SMF ¶ 27 (Plaintiffs deny fact that American did not contribute regarding the positions of the pilot committees in the arbitration because Plaintiffs assert that American supported APA's positions regarding replicating and de facto seniority adjustment); Resp. to American SMF ¶ 28 (Plaintiffs deny fact that American did not support the positions of either pilot committee and objected to each committee's position for same reasons); Resp. to American SMF ¶ 31 (Plaintiffs deny fact that APA did not take position on merits of parties' proposals or any other substantive issue at the arbitration because Plaintiffs assert that APA and American were the only parties to the arbitration and APA took positions throughout).

[12] For instance, the language of LOA 12-05 provided American with the right to object to anything that imposed costs on them or modified the seniority list. *See* LOA 12-05 at 2, Am. Ex. A [ECF No. 117-1] (under LOA 12-05, the arbitrators were to "decide what non-economic conditions should be provided to TWA Pilots," but "[i]n no event shall the arbitrators have authority to modify the Pilots' System Seniority List . . . or impose material costs beyond training costs on the Company.").

Where the Plaintiffs base their objection to American and APA's proposed statements of

undisputed fact on these two arguments, therefore, the Court finds the Plaintiffs' objection to be

without merit.  It is well established that "[t]he nonmovant . . . cannot create a genuine issue of

fact and defeat summary judgment through 'conclusory allegations, conjecture, and

speculation.'"  *Mishkin v. Gurian (In re Adler, Coleman Clearing Corp.)*, 399 F. Supp. 2d 486,

490 (S.D.N.Y. 2005) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998)).

"Rather, the nonmoving party must present 'significant probative evidence tending to support the

complaint.'"  *Smith v. Menifee*, 2002 WL 461514, at *3 (S.D.N.Y. March 26, 2002) (quoting

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  A trial court is not

required to "wade through improper denials and legal argument in search of a genuinely disputed

fact."  *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528-29 (7th Cir. 2000); *see also*

*In re Gutierrez*, 528 B.R. 1, 8 (Bankr. D. Vt. 2014) (noting that "in each instance where the

Creditor asserts one of the Debtor's 'undisputed material facts' is disputed, either (1) the fact is

not material, (2) the Creditor has failed to present significant probative evidence that any genuine

dispute of fact exists, (3) the materials upon which the Creditor relies do not establish a dispute,

or (4) the 'disputed fact' is actually a legal argument.").  And while a party opposing summary

judgment "is entitled to make legal arguments regarding the facts alleged in [the movant's

statement of facts], [ ] the Court is not obliged to accept [the nonmovant's] characterization of

those facts as facts themselves."  *Chaney v. Stewart*, 2015 WL 1538021, at *1 n.2 (D. Vt. Apr. 7,

2015) (noting that nonmovant's statement of disputed facts was deficient, in part, because

instead of contradicting the factual statements made in the movant's statement of undisputed

facts, it instead "proffers additional facts and makes legal arguments . . . .").  Indeed, courts have

criticized parties for challenging "'disputed' facts by proffering additional facts for context,

without actually contradicting the underlying factual statement" and for using their denial of

facts to make "legal argument more appropriately addressed in [a] memorandum." *Milnes v.

Blue Cross & Blue Shield of Vt.*, 2013 WL 1314520, at *2 n.1 (D. Vt. Mar. 28, 2013) (noting that

each side had "postured considerably in their statements of disputed facts" and that in its "search

for genuine factual disputes, the Court [ ] examined the documents in the summary judgment

record and not the parties' characterizations of these documents.")[13]

## B. **Plaintiffs' Claim for Breach of Duty of Fair Representation**

The Plaintiffs present a number of arguments in support of their duty of fair

representation claim, each of which the Court will address separately.

### 1. Unified Position

The Plaintiffs first argue that APA breached its duty of fair representation in structuring

the arbitration to permit two separate pilot committees to submit two competing proposals rather

than have APA present one unified pilot position. *See Plaintiffs' Statement of Additional

Material Facts Regarding APA* [ECF No. 124] ("Pl. Add'l Facts re: APA") ¶ 29.  The Plaintiffs

assert that the lack of a unified position was unprecedented, against industry custom, counter to

the advice of APA's own counsel, and was therefore a breach of APA's fiduciary duty.

As a threshold matter, this argument must be rejected because the Plaintiffs improperly

raised it for the first time in their response to the Defendants' summary judgment motions.  *See

Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or

her opposition to a dispositive motion as a means to amend the complaint.") (citing *Wright v.

Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (collecting cases)).  The Plaintiffs have

---

[13]     The Court has also reviewed the Plaintiffs' affirmative facts [ECF Nos. 122, 124], and finds them to largely
be either conclusory or legal argument.  In any event, the Court concludes that they would not be material because,
for all the reasons discussed below, they would not "affect the outcome of the suit under the governing law." *Mai v.
Colvin*, 2015 WL 8484435, at *4 (E.D.N.Y. Dec. 9, 2015) (internal quotations omitted).

known from the outset of the case that APA did not present a unified position at the arbitration

and instead appointed separate pilot committees.  But the Plaintiffs did not assert this issue as a

claim in their initial complaint, amended complaint, or various briefs in response to APA's

earlier motions to dismiss or even APA's initial summary judgment motion.  The scope of this

case is clearly limited to Paragraphs 48(E) through (J) "relating to how the arbitration was

conducted," the only claims to survive American's prior motion to dismiss.  *Krakowski,* 536 B.R.

at 372; Order at 2 [ECF No. 80] (granting in part motion to dismiss).  The Plaintiffs very clearly

identified their disputes with the arbitration process in Paragraphs 48(E) through (J) of their

Complaint, none of which included an argument about the lack of a "unified position."  *See*

Compl. ¶ 48(E)-(J).

The Plaintiffs nonetheless contend that somehow a reference in the Complaint to the

existence of two pilot committees encompasses their "unified position" claim.  *See Plaintiffs'*

*Memo. in Support of Mot. for Leave to Amend* at 3 [ECF No. 134-1] (citing Compl. ¶ 26).  While

the Complaint does reference the creation of two committees by APA, the existence of two

committees is presented only as factual background.  *See* Compl. ¶ 26.  Nothing in the Complaint

indicates a claim by the Plaintiffs based on the lack of a "unified position."  *See* Plaintiffs'

Memo. in Support of Mot. for Leave to Amend at 3-4 (citing Compl. ¶ 48(F)).  Thus, the

Complaint does not provide adequate notice to APA or American of such a claim, and has

hampered the Defendants' ability to conduct discovery on this issue.  *See* APA Opp. to Pl. Mot.

for Leave to Amend at 7-8 (noting that APA's document requests and interrogatories were

limited to the claims in Paragraphs 48(E)-(J) of the Complaint and did not include anything

about the "unified position," and that APA did not depose any witnesses on this topic);

*Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) (noting that

because plaintiff failed to include claim in amended complaint, and instead raised it for the first

time in opposition to summary judgment, the claim was waived) (citing *Rojo v. Deutche Bank*,

487 Fed. App'x 586, 588-89 (2d Cir. 2012)); *see also Lyman v. CSX Transp., Inc.*, 364 Fed.

App'x 699, 701-02 (2d Cir. 2010) (holding that claims raised for first time in opposition to

summary judgment "need not be considered" and that complaint and interrogatory response were

insufficient to put defendant on notice of plaintiff's new claims) (citing *Greenidge v. Allstate Ins.

Co.*, 446 F.3d 356, 361 (2d Cir. 2006) ("[T]he central purpose of a complaint is to provide the

defendant with notice of the claims asserted against it . . . .")).

Even if this argument were not waived, however, it would fail because the lack of a

unified position was not discriminatory, arbitrary, or in bad faith.  A claim of discriminatory

conduct could not succeed here, as both the legacy TWA pilots and the American pilots were

treated equally within the context of the arbitration and provided with the same resources,

procedures, and opportunities to present their position to the arbitrators.  *See Bowerman v. Int'l

Union*, 646 F.3d 360, 368-71 (6th Cir. 2011) (no evidence of discrimination when contested

training opportunities were available to plaintiffs and other groups); *Buford v. Runyon*, 160 F.3d

1199, 1202 (8th Cir. 1998) (no breach of duty of fair representation when two employees' cases

that were similarly treated received different outcomes).

Indeed, a claim of discrimination by the same Plaintiffs as to a related arbitration has

already been rejected by another court for much the same reason.  In *Horner v. American

Airlines, Inc.*, 2017 WL 6313943 (N.D. Tex. Dec. 11, 2017), the Texas District Court was

presented with a dispute involving an arbitration under Supplement C, which comprised the

substitute protections for the legacy TWA pilots that were put in place as a result of the very

same LOA 12-05 arbitration now before this Court.  *See id.* at *1-2.  Supplement C provided for

a dispute resolution procedure for any grievances arising thereunder. *See id*. at *2. Legacy American pilots and legacy TWA pilots both filed grievances. *See id*. The plaintiff legacy TWA pilots asserted, among other things, that APA's failure to enforce a prior agreement regarding Supplement C, as well as the stated intent of Supplement C, was arbitrary and hostile. *See id*. at *7. They asserted that APA's decision to allow the arbitration between the opposing sides and to remain neutral throughout the process was due to hostility against the legacy TWA pilots, and that the grievance process was undermined as a result. *See id*. at *7. But the court in *Horner* ultimately held that "maintaining neutrality and providing two groups of employees the same resources to pursue arbitration could only be found to be reasonable. And because the two groups were provided equal opportunity to assert their cases, the procedure cannot be deemed discriminatory." *Id*. at *9 (internal citations and quotations omitted).[14]

Nor can the Plaintiffs show that the conduct of the APA in utilizing two ad hoc pilot committees was arbitrary, that is, "so far outside a wide range of reasonableness . . . as to be irrational." *O'Neill*, 499 U.S. at 67 (internal citations and quotations omitted). The Plaintiffs complain that APA did not work to develop a unified position to present to the arbitrators. More specifically, they note that the Chairman of the APA Negotiating Committee did not work on crafting a unified position but instead Captain Stephens and Captain Gabel were tasked, on behalf of their respective pilot groups, with developing an APA position for the arbitration. *See* Pl. Add'l Facts re: APA ¶¶ 33, 34. The Plaintiffs note that Captains Stephens and Gabel had one substantive meeting, which, according to Captain Stephens, "didn't go very long" because it "became clear relatively early that we were conceptually very far apart." Pl. Add'l Facts re:

---

[14]    Perhaps for these reasons, the Plaintiffs appear to concede that the claim does not involve discriminatory conduct on the part of APA. *See* Pl. Opp. to APA SJM at 7 (arguing that lack of a unified position was arbitrary and bad faith, but making no reference to discrimination).

APA ¶ 34 (quoting Pl. Ex. 18, Stephens Depo. Tr., 13-14, 23, June 8, 2016 [ECF No. 124-18]).

Rather than making further efforts to develop a unified position, the APA instead entered into the

Protocol Agreement with American that created the AA Pilots Committee and the TWA Pilots

Committee and gave them each "party status" at the arbitration.  *See* Pl. Add'l Facts re: APA ¶¶

35-36 (explaining that each committee presented competing proposals to the arbitrators).

But as the *Horner* court found, it was reasonable for APA to remain neutral and allow

each of the pilot groups an opportunity to present their cases.  *Horner*, 2017 WL 6313943, at *9.

Indeed, the undisputed facts demonstrate the difficulty of arriving at a unified position that

would satisfy both pilot groups.  APA's counsel Mr. James testified that though he had once

hoped the two groups could come together on a unified position, he later characterized such

hopes as "unfounded."  APA Ex. 26, James Depo. Tr. 29:9-10, June 14, 2016 [ECF No. 128-7].

That view was echoed by the Chair of the TWA Pilots Committee, Captain Gabel, who

characterized the hope of the two sides coming together as "a pipe dream."  APA Ex. 9-J, Gabel

email [ECF No. 111-14]; Pl. Opp. to APA SJM at 6 (Plaintiffs' conceding that the two sides had

been "conceptually very far apart").  Indeed, the Court cannot help but notice the profound

distrust—and lack of agreement—between the legacy TWA and American pilots throughout the

record of the years-long litigation in this Court alone, encompassing three adversary proceedings,

multiple dispositive motions, and amended complaints in each.  *See, e.g., Krakowski v. American

Airlines, Inc., (In re AMR Corp.),* 567 B.R. 247 (Bankr. S.D.N.Y. 2017); *Krakowski v. American

Airlines, Inc., (In re AMR Corp.),* 538 B.R. 213 (Bankr. S.D.N.Y. 2015); *Krakowski v. American

Airlines, Inc., (In re AMR Corp.),* 536 B.R. 360 (Bankr. S.D.N.Y. 2015); *Krakowski v. American

Airlines, Inc., (In re AMR Corp.),* 2015 WL 2414750 (Bankr. S.D.N.Y. May 19, 2015);

*Krakowski v. American Airlines, Inc., (In re AMR Corp.),* 2014 WL 2508729 (Bankr. S.D.N.Y. June 3, 2014).

Moreover, the process of conducting arbitrations with separate presentations from employee sub-groups is an accepted method of balancing competing employee interests. Indeed, the court in *Horner* ruled that a similar arbitration process involving the very same parties did not breach APA's duty of fair representation. *See Horner*, 2017 WL 6313943, at *9. In that case, the Plaintiffs asserted that APA had advanced the parties' grievances to arbitration "in a manner that pitted pilot (Plaintiff Bounds) versus pilots (three legacy American pilots)." *Id.* at *7. The plaintiffs argued that "this choice to allow arbitration and remain neutral throughout the arbitration process is due to the new APA President's hostility toward former TWA pilots [and] that the grievance process was irredeemably undermined as a result." *Id.* But the *Horner* court found that "given its membership's contentious split over [the protections at issue], a reasonable jury could only find that APA concluded that the circumstances warranted neutrality." *Id.* at *8. Furthermore, "when 'faced with two groups of its members with objectives that were directly at odds . . . [submitting] the impending dispute to arbitration was an equitable and reasonable method of resolving it." *Id.* (quoting *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1107 (2d Cir. 1991)).[15]

---

[15]    Likely for this reason, arbitrations involving different pilot groups have been utilized to resolve merger-related issues for years. *See, e.g.*, *Oling v. Air Line Pilots Ass'n*, 346 F.2d 270 (7th Cir. 1965) (after merger of United and Capital Air Lines, arbitration between representatives of each pilot group, arranged by union representing both groups); *Carr v. Airline Pilots Ass'n, Int'l*, 2016 WL 4061145 (S.D. Tex. July 29, 2016) (after merger of United and Continental, arbitration between representatives of each pilot group, arranged by union representing both groups). Arbitration is also commonly used as a continuing process of dispute resolution to address issues between merged employee groups. *See, e.g.*, *Pilots Representation Org. v. Airline Pilots Ass'n, Int'l*, 2007 WL 2480349, at *1 (D. Minn. Aug. 24, 2007); *Marcucilli v. American Airlines, Inc.*, 2007 WL 713146, at *7 (E.D. Mich. Mar. 7, 2007). Additionally, unions utilize arbitration to resolve other types of intra-union issues, such as disputes relating to the allocation of funds among employees represented by the union. *See, e.g.*, *Barnes v. Air Line Pilots Ass'n, Int'l.*, 141 F. Supp. 3d 836, 839 (N.D. Ill. 2015).

While the Plaintiffs assert that APA has never previously used ad hoc committees in an interest arbitration, this distinction is unavailing. The fact that this case involved an interest arbitration does not by itself bar the use of this type of arbitration process. The Plaintiffs do not provide any case authority in support of such a notion or even any logical reason why this would be the case. And while the circumstances here are somewhat unusual—the abrogation of a collective bargaining agreement in bankruptcy—it was nonetheless a circumstance under which APA was faced with an intractable dispute between two pilot groups. *See Horner*, 2017 WL 6313943, at *8.

Turning to the third leg of the duty of fair representation inquiry, the Plaintiffs argue that APA's failure to take a unified position was in bad faith because it was against the advice of APA's own counsel. The Plaintiffs rely upon an early draft of LOA 12-05 that explicitly contemplated participation by both American and TWA pilots, but was changed by Mr. James. *See* Pl. Add'l Facts re: APA ¶ 28. An email of Mr. James explained he was at that time "of the view that it is APA v. AA and we get an institutional position rather than invite the AA pilots to beat up on the TWA pilots without the latter being able to threaten to re-open the seniority list." *See* Pl. Add'l Facts re: APA ¶ 28 (quoting Pl. Ex. 8, James email [ECF No. 124-8]). When appearing before the Court to obtain approval of LOA 12-05, Mr. James also stated that "'we have the legal duty to go in and make the presentation on what ought to happen and the company will make its presentation . . . .'" Pl. Add'l Facts re: APA ¶ 30 (quoting Pl. Ex. 15, Hr'g Tr. 32:1-3, Dec. 19, 2012 [ECF No. 124-15]). But taking all these facts to be true, APA's failure to present a "unified position" does not qualify as bad faith, which would require that APA have engaged in "fraud, dishonesty, [or] other intentionally misleading conduct . . . with an improper intent, purpose, or motive." *See Vaughn,* 604 F.3d at 709–10 (internal citations and quotations

omitted).[16]  As explained above, the undisputed facts demonstrate the futility of insisting upon a

unified pilots position here.  Under such circumstances, it cannot be said that APA's actions

were in bad faith.

The Plaintiffs also argue that APA's action was in bad faith because it was taken to

protect APA.  The Plaintiffs cite to an email in which APA general counsel Steven Hoffman

observed that APA's potential liability would be diminished by allowing both the legacy TWA

pilots and American Pilots to present their proposals directly to the arbitrators.  *See* Resp. to

APA SMF ¶ 83 (quoting Pl. Ex. 8, Hoffman email [ECF No. 124-8]).  But while Mr. Hoffman

noted that a "unified position" would be vulnerable to challenge by any pilots dissatisfied with

the results of the arbitration, *id*., such statements do not reflect an "improper intent, purpose, or

motive" of APA in how the arbitration was structured.  Rather, Mr. Hoffman concluded that this

structure protected APA precisely because it fulfilled APA's duty to ensure that all groups,

including the legacy TWA pilots, had adequate representation at the arbitration.  *See* Pl. Ex. 8,

Hoffman email [ECF No. 124-8] ("If incumbent APA and TWA people did their own

presentations to the arbitrator, the decision would be on the arbitrator, not us.");[17] *see also*

*Vaughn,* 604 F.3d at 710; *Horner*, 2017 WL 6313943, at *9 ("[P]laintiffs do not assert facts that

would support a reasonable finding of the 'substantially egregious' conduct required to infer that

APA's neutrality was motivated by a desire to harm APA's membership . . . [w]ithout additional

---

[16]    Mr. James' statements and actions early in the arbitration process are easily explained by Mr. James himself: while he had once hoped the two groups could come together on a unified position, he eventually realized that such a hope was unfounded.  *See* APA Ex. 26 (James Depo. Tr. 29:9-24, June 14, 2016) [ECF No. 128-7].

[17]    This is also consistent with the public position that APA had taken that the two committee structure ensured full participation of all constituents and fulfilled APA's legal duties.  *See* APA Ex. 22-B (APA article regarding Supplement CC Interest Arbitration: Agreement and Procedure, dated Feb. 10, 2013) [ECF 128-3] ("APA has the legal duty to fairly represent all pilots subject to the provisions of the CBA.  Consequently, APA is providing both the former TWA pilots and the pre-merger AA pilots with an opportunity to make separate cases regarding proposed modifications to the CBA.  APA is also providing both groups with equal union resources to prepare and present those cases.").

evidence of deceitful, malicious, or improper acts, a reasonable jury could not find that APA's neutrality and submission of grievances breached the duty of fair representation.") (internal citations and quotations omitted).

Last but not least, the Plaintiffs' claim about lack of a unified position fails the causation requirement. This is because—even considering all inferences in favor of the Plaintiffs—a reasonable jury could not conclude that a "unified position" would have achieved a more favorable outcome from the arbitrators. Even if APA had wholly adopted the position that was advocated by the TWA Pilots Committee, that position was ultimately rejected by the arbitrators as violating LOA 12-05 because it did not constitute "preferential flying rights," but rather "effectively modif[ied] the position of the TWA pilots on the system seniority list (at least for some purposes)." Resp. to APA SMF ¶ 122 (quoting APA Ex. 9-H, Arbitrators' Panel Suggestion Regarding Post-Hearing Submissions at 3 [ECF No. 111-12]). Notably, the arbitrators unanimously agreed on this issue with American, an independent participant acting consistent with its rights under LOA 12-05 and the Protocol Agreement. Taking the Plaintiffs' allegations at face value, therefore, their interests were not hampered by having their own separate representation and right to present their views unfiltered at the arbitration, rather than proceeding through a unified pilots position.

2.   Allegation that APA Failed to Enforce LOA 12-05

The Plaintiffs also allege that APA failed to enforce the intent of LOA 12-05, which the Plaintiffs maintain was to "replicate" the protections of Supplement CC. But this exact same argument was previously presented by the Plaintiffs and rejected in a detailed decision previously issued by this Court in this case. *See Krakowski*, 536 B.R. at 370-71. In ruling, the Court observed that "it would be impossible to make an exact copy or duplicate of those St.

Louis protections", *id*. at 371, given that American intended to close the St. Louis base.  In a

ruling that echoes the thinking of the arbitrators on the same issue, this Court rejected the

Plaintiffs' attempt to shoehorn the concept of "replicate" into LOA 12-05.  *See id.*[18]  Instead, the

Court concluded that LOA 12-05 instead provided for an arbitration procedure to arrive at

substitute job protections.  *See id*. at 370-71 ("The intent of LOA 12-05 was clear from its

written terms: 'The Company and the APA agree that a dispute resolution procedure is necessary

to determine what *alternative* contractual rights should be provided to TWA Pilots as a result of

the loss of flying opportunities due to termination of Supplement CC and the closing of the STL

base.'") (emphasis in original).[19]  This ruling is the law of the case and cannot be revisited here.

*See Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (law of the case

doctrine "posits that if a court decides a rule of law, that decision should continue to govern in

subsequent stages of the same case.") (internal citations and quotations omitted); 18B Charles

Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 4478 (2d ed. April 2018 Update)

("Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of

matters once decided during the course of a single continuing lawsuit.").

The Plaintiffs' position is doomed for another reason: APA took no position on the

"replicate" issue at the arbitration, choosing instead to remain neutral and allow both sides to

---

[18]      Indeed, when the Plaintiffs subsequently sought discovery on the issue, the Court rejected the request,
reiterating that the issue was "off the table."  APA Ex. 24 (Hr'g Tr. at 64-66, 69-70, Feb. 16, 2016 [ECF No. 128-
5]).  The Court considers the Plaintiffs' repeated repackaging of its arguments on this same issue to border on a
violation of Fed. R. Civ. P. 11.

[19]      The Plaintiffs argue that in its prior decision on the issue, the Court did not explicitly strike Paragraph 48(I)
of the Complaint, which uses the word "replicate."  But that paragraph of the Complaint also references arguments
other than replicate.  *See* Compl. ¶ 48(I) (discussing APA taking a position through the AA Pilots Committee that
"was designed to take jobs from the former TWA pilots to the benefit of the legacy American pilots . . . .").  It is
clear from this Court's prior decision that Paragraph 48(I) was preserved only to the extent that it did not relate to
the "replicate" argument.  *See Krakowski*, 536 B.R. at 371 ("[T]he Court categorically rejects Plaintiffs' reliance on
the term 'replicate' as an independent basis for any rights asserted by the Plaintiffs.").

present their positions without interference.  As previously discussed, and further expanded on below, APA's neutrality eviscerates any duty of fair representation claim on this issue as the TWA Pilots Committee was given free rein to advocate extensively for the "replicate" standard during the arbitration.  *See* Resp. to APA SMF ¶¶ 104-09; *see also* APA Ex. 1-F (LOA 12-05 Merits Opinion at 5 [ECF No. 92-9]) (arbitrators rejecting TWA Pilots Committee's replicate argument).[20]

### 3.  Allegations Relating to Lack of Input from Plaintiffs or Putative Class

The Plaintiffs next complain that the legacy TWA pilots lacked of input on certain aspects of the arbitration process, specifically with respect to the selection of the arbitrators, the arbitration participants, and the lawyers in the arbitration.  *See* Compl. ¶¶ 48(E), (F), (G), (H).

---

[20]    After the parties finished briefing these motions for summary judgment, the Plaintiffs filed a motion to amend the Complaint to add claims relating to APA's lack of a "unified position" and failure to "replicate" Supplement CC.  [ECF No. 134].  It appears that the motion was filed in response to the Defendants' argument that the Plaintiffs improperly raised the lack of a unified position and failure to replicate for the first time in opposition to summary judgment.  *See* APA Opp. to Plaintiffs' Mot. for Leave to Amend at 1-2, 8-9 [ECF No. 135]; *American's Memo. of Law in Opp. to Plaintiffs' Mot. for Leave to Amend* at 1 [ECF No. 136].  But as the Court today rules in the Defendants' favor on the merits of these two issues, however, leave to amend to add these two issues to the Complaint would be futile.  *See Vermont Country Foods, Inc. v. So-Pak-Co., Inc.*, 170 Fed. App'x 756, 759 (2d Cir. 2006); *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110-11 (2d Cir. 2001).  Even if that were not the case, it would be improper to allow amendment of the Complaint at this late point in time.  The Complaint has already been supplemented and amended by the Plaintiffs several times.  *See* ECF Nos. 32-1, 48, 134-2.  The Plaintiffs have known from the outset of the case that APA did not present a unified position at the arbitration but instead appointed two separate pilot committees.  Yet the request to amend the Complaint came over three years after this case was filed, five months after the close of discovery, and a week after the conclusion of briefing on the Defendants' summary judgment motions.  Amendments in such circumstances are prejudicial.  *See Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (in affirming denial of leave to amend complaint, noting length of delay, that discovery had been completed and summary judgment motion was pending); *Classicberry Ltd. v. Musicmaker.com, Inc.*, 48 Fed. App'x 360, 362 (2d Cir. 2002) ("[B]ecause defendants made their motion to amend after discovery had closed and plaintiffs had moved for summary judgment, the amendment would have been especially prejudicial.") (internal citations and quotations omitted); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) ("A proposed amendment . . . [is] especially prejudicial . . . [when] discovery had already been completed and [non-movant] had already filed a motion for summary judgment.") (internal citations and quotations omitted).  For all these reasons, the Plaintiffs' motion to amend is denied.

### i. Selection of Committee Members

The Plaintiffs first assert that APA improperly selected the members of the TWA Pilots Committee without input from either the Plaintiffs or the putative class members. But this argument is without any basis whatsoever. Two APA Board members from St. Louis who were legacy TWA pilots—Captain Bounds and Captain Spiegel—chose Captain Gabel to chair the TWA Pilots Committee. *See* Resp. to APA SMF ¶ 24. Captain Gabel then chose the other members of the TWA Pilots Committee, all of whom were legacy TWA pilots. *See* Resp. to APA SMF ¶ 25. These included Captain Dave Williams, Captain John Swanson, First Officer Cary Bouchard, and First Officer Thomas Duncan. *See* Resp. to American SMF ¶ 16; Resp. to APA SMF ¶ 25.

Thus, the manner in which the TWA Pilots Committee members were chosen was reasonable because APA received input from members of the putative class, both directly and indirectly, regarding selection of the TWA Pilots Committee. Selection of that committee was entirely delegated to three putative class members—Captains Bounds, Spiegel, and Gabel—all of whom were former TWA pilots. *See* Resp. to American SMF ¶¶ 12, 17. Additionally, all three were representatives of the legacy TWA pilots, as each was currently, or at some point in the immediate past, had been elected to union office by other former TWA pilots in St. Louis.[21] *See* Resp. to APA SMF ¶¶ 11, 12, 17.[22] Though Captain Gabel's term as an APA Board member expired prior to the arbitration, that fact alone does not support a conclusion that his interest no longer aligned with those of the legacy TWA pilots.

---

[21]    During the relevant time period, nearly all of APA members at the St. Louis base—at least 93%—were former TWA pilots, and nearly all former TWA pilots—approximately 85%—were APA members at St. Louis. *See* Resp. to APA SMF ¶ 11.

[22]    In 2012, APA board members elected from the St. Louis base were Captains Bounds and Gabel. *See* Resp. to APA SMF ¶ 12. During 2012, Captain Gabel reached his term limit as an APA board member and the St. Louis base elected Captain Spiegel to replace him. *See* Resp. to APA SMF ¶ 17.

Instead of this procedure, the Plaintiffs argue that APA should have allowed all former

TWA pilots to vote on the members of the TWA Pilots Committee. *See* Resp. to American SMF

¶ 31. But selecting the actual composition of a committee through a member election would

have been unprecedented, *see* Resp. to American SMF ¶ 32,[23] and such a selection method would

have no doubt opened up APA to a legal challenge. The Plaintiffs' position is also fatally flawed

given the manner in which the TWA Pilots Committee mirrored the selection method for the AA

Pilots Committee. The APA Board members other than Captain Bounds and Captain Spiegel

chose Captain Stephens to chair the AA Pilots Committee, and Captain Stephens then chose the

other members of that committee. *See* Resp. to American SMF ¶ 15; Resp. to APA SMF ¶ 34.

Thus, both pilot groups were treated equally.

In any event, the process a union employs need not be the most representative that is

theoretically possible at the expense of being realistically workable. In rejecting the Plaintiffs'

member election option, the Court is mindful that it should take a "highly deferential" approach,

"recognizing the wide latitude that [unions] need for the effective performance of their . . .

responsibilities." *O'Neill*, 499 U.S. at 78. "[S]imple negligence, ineffectiveness, or poor

judgment is insufficient to establish a breach of the union's duty … Rather, the union's conduct

must be grossly deficient or in reckless disregard of the member's rights" to support a duty of

fair representation claim. *Williams v. Air Wisconsin, Inc.*, 874 F. Supp. 710, 716 (E.D. Va.

1995), *aff'd*, 74 F.3d 1235 (4th Cir. 1996).[24]

---

[23]     The Plaintiffs deny this statement of fact, averring that the APA polled a distinct pilot group in the past and that the American Independent Cockpit Alliance polled its members regarding the LOA 12-05 process. *See* Resp. to APA SMF ¶ 32. But polling a group on an issue is distinct from having that group directly elect members of a committee, and the Plaintiffs do not offer evidence that this has ever taken place.

[24]     Relatedly, Plaintiff Sikes complains that she told one of the TWA Pilots Committee members it would be good to have a non-APA member on the committee because there were many non-APA members in St. Louis that would be affected by the arbitration, but that APA would not allow it. *See* Pl. Add'l Facts re: APA ¶ 74. But there is no dispute that APA has traditionally limited committee participation to union members and that the APA Constitution and Bylaws require that committee members must also be APA members. *See* APA Ex. 25 (Gabel

The Plaintiffs also challenge the differences in the composition of the TWA Pilots Committee versus the AA Pilots Committee by noting that only the latter had union insiders on it.  But by letting each group choose its committee membership independent of one another, APA fulfilled its fiduciary duty to "establish[] neutral and valid processes and procedures for the arbitration."  *Carr*, 2016 WL 4061145, at *15.  The Plaintiffs argument essentially asserts that a limitation regarding union insiders should have been placed on the AA Pilots Committee when it is undisputed that APA imposed no similar limitation regarding linemen on the TWA Pilots Committee, the chairman of which had recently been on the APA Board, unlike any member of the AA Pilots Committee.  *See* Resp. to APA Facts ¶ 37.  The Plaintiffs admit that it would not have been fair for the former TWA pilots to participate in selection of the AA Pilots Committee members, just as it would not have been fair for legacy American pilots to participate in selection of the TWA Pilots Committee members.  *See* Resp. to APA SMF ¶ 36.  Allowing either pilot group to have input or control over the other's process could have been a violation of APA's fiduciary duties.  There is also no evidence that the selection process was structured by APA in bad faith.  Nor is there evidence of fraud, dishonesty, or other intentionally misleading conduct with an improper intent, purpose, or motive.  *See Vaughn,* 604 F.3d at 709–10.

Last but not least, the Plaintiffs have failed to make a causation showing with respect to selection of the TWA Pilots Committee.  The Plaintiffs—and indeed all legacy TWA pilots—had the opportunity to rectify any lapses by the TWA Pilots Committee given the ability of individual pilots to directly participate in the arbitration.  All pilots were given the opportunity to make written submissions and oral presentations to Arbitrator Bloch in Washington, D.C. and St.

---

Depo. Tr. 57:21-23, May 27, 2016 [ECF No. 128-6]); *APA Reply Memo. in Support of Mot. for Summ. J.* at 9 [ECF No. 128].

Louis on May 14-15, 2013, regarding the impact on them from the loss of Supplement CC and

the St. Louis base.  *See* Resp. to APA SMF ¶¶ 93, 96; Resp. to American SMF ¶ 25.  The

Plaintiffs seek to characterize this process as simply a venting session for pilots and note that

only one arbitrator attended.  *See* Resp. to APA SMF ¶ 99; Pl. Ex. 4 (Horner Depo. Tr. 48-49,

May 10, 2016 [ECF No. 124-4]).  But the Plaintiffs offer no evidence that Arbitrator Bloch did

not convey the information obtained at the sessions to his fellow arbitrators, or that the

arbitrators failed to consider the information provided during this session.  And despite how the

Plaintiffs choose to characterize it, there is evidence that this process was fully utilized, with the

arbitrators receiving some 270 written submissions from pilots.  *See* Resp. to American SMF ¶

25.  Moreover, parties other than the TWA Pilots Committee, the AA Pilots Committee,

American, and APA were allowed to make oral presentations to Arbitrator Bloch.  Legacy TWA

pilots took particular advantage of this process: of the 55 oral presentations made, 43 of these

were made by legacy TWA pilots.  *See* Resp. to American SMF ¶ 25.  Indeed, participants in the

process included Plaintiff Sikes, who endorsed the proposal made by the TWA Pilots

Committee, and Keith Bounds, a St. Louis representative who presented a statement on behalf of

120 legacy TWA pilots.  *See* Resp. to American SMF ¶ 25.  Such robust participation

undermines the Plaintiffs' position.  *See Santiago v. Nat'l Cleaning Contractors*, 1992 WL

168258, at *6 (S.D.N.Y. June 29, 1992) ("Where an employee has had a chance to present his

case, despite union lapses in representation, courts have granted summary judgment dismissing

fair representation claims."); *Romero v. DHL Express, Inc.*, 2015 WL 1315191, at *9 (S.D.N.Y.

Mar. 24, 2015).

    The Plaintiffs also do not present any evidence that the individuals that chose the TWA

Pilots Committee members were in some way averse to the legacy TWA pilots or that their

ability to choose committee members was thwarted by APA.  Indeed, Plaintiff Alicia Sikes

testified that she had "great respect" for Captain Gabel and "would not object to him being

selected to any committee at APA."[25]  Resp. to APA SMF ¶ 26 (quoting APA Ex. 12, Sikes

Depo. Tr. 20:10-15, May 10, 2016 [ECF No. 111-20]).  She further testified that the other

members of the TWA Pilots Committee were all "very competent."  Resp. to APA SMF ¶ 27

(quoting APA Ex. 12, Sikes Depo. Tr. 22:8-9, May 10, 2016 [ECF No. 111-20]).  Additionally,

Plaintiff Sikes assisted the TWA Pilots Committee's counsel throughout the LOA 12-05

proceedings.  *See* Resp. to APA SMF ¶ 101.  Plaintiff John Krakowski could not think of anyone

else who would have been a better choice for the TWA Pilots Committee.  *See* Resp. to APA

SMF ¶ 28.  Plaintiff Horner testified that he did not have any objection to Captain Gabel or any

of the other members of the TWA Pilots Committee.  *See* Resp. to APA SMF ¶ 29.[26]  Moreover

Plaintiff Horner testified that changing the membership of the TWA Pilots Committee would

---

[25]    This is not surprising given that Captain Gabel has been an active participant in this litigation on behalf of
the Plaintiffs, serving as the Plaintiffs' principal witness and consulting with Plaintiffs' counsel in his deposition of
Edgar James.  *See generally* Pl. Ex. 4 (Gabel Decl. in Support of Resp. to APA SMF [ECF No. 97-4]); APA Ex. 15
(James Depo. Tr. at 7-8, June 14, 2016 [ECF No. 111-23]) (Plaintiffs' counsel noting on the record that Captain
Gabel, among others, has been assisting in counsel's representation of the class).  It is odd then that the Plaintiffs
invoke his participation in the arbitration as a basis for relief here.

[26]    The Plaintiffs deny all of the statements of fact relevant to this issue.  *See* Resp. to APA SMF ¶¶ 26-29.  All
of the Plaintiffs' denials are based on their legal arguments about the lack of a unified position by APA and the two-
committee structure.  But as discussed above, however, these two legal arguments do not provide a basis for
disputing the rather straightforward facts at issue here.

Moreover, the denials are problematic for other reasons.  With respect to the statements made by Plaintiff
Sikes, for example, the Plaintiffs state that Plaintiff Sikes testified that there should never have been a TWA Pilots
Committee and that she had told Captain Gabel this.  Resp. to APA SMF ¶ 26.  But this does not deny the fact that
she made these statements.

With respect to the statements made by Plaintiff Krakowski, the Plaintiffs assert that Plaintiff Krakowski
testified that his complaint was to the entire LOA 12-05 process.  Resp. to APA SMF ¶ 28.  But this does not
address the fact in question.

With respect to the statements made by Plaintiff Horner, the Plaintiffs assert that Plaintiff Horner objected
to the TWA Pilots Committee because it was the union creating a subclass when the union was instead required to
represent the pilots as a whole.  Resp. to APA SMF ¶ 29.  The Plaintiffs also assert that Plaintiff Horner did not
support Captain Gabel's decision to chair the TWA Pilots Committee and told Captain Bounds that he was
concerned with their general involvement.  Resp. to APA SMF ¶ 29.  But Plaintiff Horner's testimony didn't address
their fitness for the position.  *See* Pl. Ex. 4 (Horner Depo. Tr. 27:12-15, 32:12-18, May 10, 2016 [ECF No. 124-4]).

"absolutely not" have improved the situation for the legacy TWA pilots.  *See* Resp. to APA SMF ¶ 30 (quoting APA Ex. 11, Horner Depo. Tr. 34:11-14, May 10, 2016 [ECF No. 111-19]).[27]

### ii.  Selection of Arbitrators

For reasons similar to those discussed above as to member selection, the Plaintiffs' claim regarding the selection of the arbitrators also fails.  American and APA both agreed that Arbitrator Bloch should serve as the principal arbitrator because he is a prominent Railway Labor Act arbitrator that is familiar to practitioners in the airline industry.  *See* Resp. to American SMF ¶ 6.  Important for this case, Captains Gabel and Bounds—APA board members from St. Louis who also happened to be legacy TWA pilots—approved the language of LOA 12-05 that identified Arbitrator Bloch as the principal arbitrator.  *See* Resp. to APA SMF ¶¶ 20, 39-40; Resp. to American SMF ¶ 8.  The Protocol Agreement provided that in addition to Arbitrator Bloch, the members of the arbitration panel would include Stephen Goldberg and Ira Jaffe.  *See* Resp. to American SMF ¶ 12.  But it was Captain Gabel who had suggested the appointment of Arbitrator Goldberg and Arbitrator Jaffe as the remaining two arbitrators, and APA accepted his suggestion.  *See* Resp. to APA SMF ¶ 51; Resp. to American SMF ¶ 12.[28]

Moreover, the Plaintiffs do not allege that Captains Gabel and Bounds acted irresponsibly or unfairly in picking the arbitrators and none of them asked APA to replace the arbitrators.  *See* Resp. to APA SMF ¶¶ 46, 48-49, 53-55.  Indeed, no legacy TWA pilots ever complained to Captain Gabel regarding the selection of Arbitrators Goldberg or Jaffe.  *See* Resp. to APA SMF ¶ 53.  Additionally, subsequent to entry into LOA 12-05, APA held a large gathering of legacy

---

[27]    The Plaintiffs also argue that the TWA Pilots Committee should have refused to participate in the arbitration process, *see* Resp. to APA SMF ¶ 90, but they offer no evidence (or even theory) as to how this would have attained a better result for the legacy TWA pilots or why the TWA Pilots Committee's lack of refusal to participate constitutes a breach of duty by APA.

[28]    APA subsequently asked American to accept Arbitrator Goldberg and Arbitrator Jaffe as arbitrators, which it did.  *See* Resp. to American SMF ¶ 12.

TWA pilots. *See* Resp. to APA SMF ¶ 43. At that meeting, APA informed the pilots that

Arbitrator Bloch had been listed to chair the arbitration panel and none of the pilots present

requested that APA replace Arbitrator Bloch. *See* Resp. to APA SMF ¶¶ 43-44.[29]

The Plaintiffs note that Arbitrator Bloch had previously ruled against the legacy TWA

pilots in prior arbitrations.[30] But the fact that Arbitrator Bloch had previously ruled against the

legacy TWA pilots does not make his selection as an arbitrator arbitrary, discriminatory, or in

bad faith, and Plaintiffs have not provided evidence that his rulings were so egregious as to make

it so. *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 330 (6th Cir. 1998) ("An adverse

award in and of itself is no evidence of bias absent some evidence of improper motivation."). In

fact, Captain Gabel and the TWA Pilots Committee decided that Arbitrator Bloch was a good

---

[29]    Plaintiff Horner did ask why Arbitrator Bloch had been selected, noting that Arbitrator Bloch had ruled
against the legacy TWA pilots in a prior arbitration. *See* Resp. to APA SMF ¶¶ 45-46. But Plaintiff Horner never
asked Mr. James or any APA officer or board members to replace Arbitrator Bloch, instead raising his concerns with
Captain Williams, a member of the TWA Pilots Committee. *See* Resp. to APA SMF ¶ 46. The TWA Pilots
Committee did not take action on the complaint or object to the selection of Arbitrator Bloch, but that failure to act
cannot be a basis for a breach of duty claim against APA. *See* Resp. to APA SMF ¶¶ 42, 45-47.

[30]    The Plaintiffs raise a few other objections in their pleadings, none of which have merit. The Plaintiffs
object to APA's statement of fact that Plaintiff Horner's only objection to Arbitrator Bloch was that he had ruled
against TWA pilots in past arbitrations. *See* Resp. to APA SMF ¶ 47. They also assert that Plaintiff Horner
objected to Arbitrator Bloch, along with Arbitrator Goldberg and Arbitrator Jaffe because the entire process was
flawed and that as to the selection of arbitrators, the union and the company should have each picked one, and those
two arbitrators should have picked a neutral. *See* Resp. to APA SMF ¶¶ 47, 55 (citing Pl. Ex. 4, Horner Depo. Tr.
68, May 10, 2016 [ECF No. 124-4]). But the Plaintiffs have not articulated a theory whereby this proposed process
would have been better than allowing the TWA Pilots Committee to exercise more influence over the selection.
Such an argument would be counter-intuitive.

        The Plaintiffs object to APA's statement of fact that Plaintiff Sikes never raised an objection with anyone
regarding the selection of Arbitrator Bloch, asserting that Plaintiff Sikes objected to him on the second day of the
arbitration. *See* Resp. to APA SMF ¶ 48 (citing Pl. Ex. 2, Sikes Depo. Tr. 43-44, 48, May 10, 2016 [ECF No. 124-
2]). But in her testimony, Plaintiff Sikes raises no specific objection to Arbitrator Bloch himself, rather to the
structure of the arbitration, as well as the seat placement of APA and American next to one another and counsel
"having chats with the arbitrators" during breaks, though she admits she was unaware of the content of those chats.
*Id.*

        The Plaintiffs also object to APA's statement of fact that Plaintiff Krakowski never raised an objection with
anyone regarding the selection of Arbitrator Bloch. *See* Resp. to APA SMF ¶ 49 (citing Pl. Ex. 3, Krakowski Depo.
Tr. 38, May 25, 2016 [ECF No. 124-3]). But in his testimony, Plaintiff Krakowski raises no specific objection with
the arbitrators themselves, rather stating that they should have been selected in the manner used under the RLA, an
argument rejected above. *See id.*

choice for the LOA 12-05 arbitration, even after considering this criticism of him.  *See* Resp. to

APA SMF ¶ 41.  Given these facts, it cannot be said that APA acted discriminatorily, arbitrarily

or in bad faith.  *See Demetris v. Transp. Workers Union of Am.*, 2015 WL 474826, at *6 (N.D.

Cal. Feb. 4, 2015) (a union does not have to make a "perfect decision or even a particularly good

decision," but rather must only act in a rational manner that does not discriminate).

The Plaintiffs also argue that because LOA 12-05 stated that the arbitration was being

conducted under Section 7 of the Railway Labor Act ("RLA"), the arbitrators should have been

selected in accordance with the RLA.  Section 7 of the RLA provides that the union and the

company each pick an arbitrator, and those two arbitrators then select a third "neutral" arbitrator.

*See* 45 U.S.C. § 157.  But parties can waive default procedural requirements of the RLA, and no

objection to the selection of the arbitrators was ever presented based on Section 7.  *See, e.g.,*

*Krieter v. Lufthansa German Airlines, Inc.*, 558 F.2d 966, 968 (9th Cir. 1977).  In any event, the

procedures adopted by APA were *more* favorable than those set out in the RLA, as Captain

Gabel chose two of the arbitrators and Captains Gabel and Bounds approved the third.  Under the

RLA procedures, the legacy TWA pilots would have been consigned to working with the AA

Pilots Committee to agree on APA's lone selection, with no influence on the selection of the

other two arbitrators.

### iii.   Selection of Counsel

The Plaintiffs argument about selection of counsel for each of the pilot committees in the

arbitration fails for similar reasons.  Each committee chose its own counsel, with the TWA Pilots

Committee choosing John Clarke[31] and the AA Pilots Committee selecting Wesley Kennedy.[32] *See* Resp. to APA SMF ¶¶ 60-61, 68.

In their briefs opposing summary judgment, the Plaintiffs do not raise any issues with respect to the selection of Mr. Clarke as counsel for the TWA Pilots Committee, seemingly dropping their prior claims regarding his selection. In any event, the Court concludes—for the same reasons discussed above regarding selection of the members of the TWA Pilots Committee—that APA acted appropriately in allowing the TWA Pilots Committee to choose its own counsel. Additionally, the Plaintiffs fail to establish that the selection of Mr. Clarke caused them harm. They do not claim that Mr. Clarke was unqualified to represent them, and in fact engaged him in other proceedings both prior and subsequent to the LOA 12-05 arbitration.[33] Indeed, Mr. Clarke had extensive experience, including arguing five cases at the Supreme Court, three of which involved the interpretation of the RLA. *See* Resp. to APA SMF ¶¶ 64, 67. Plaintiffs have not even attempted to show that a different counsel might have produced better results for the former TWA pilots.[34]

---

[31]      Consistent with their general theory in the case, the Plaintiffs assert that APA influenced the TWA Pilots Committee's choice of Mr. Clarke as its counsel because the TWA Pilots Committee was formed by APA and given party status under LOA 12-05. *See* Resp. to APA SMF ¶ 61. But that does not demonstrate in any way that APA made the decision to select Mr. Clarke.

[32]      The Plaintiffs deny that the AA Pilots Committee chose Mr. Kennedy and instead assert that Mr. Kennedy was chosen by APA to represent the AA Pilots Committee. *See* Resp. to APA SMF ¶¶ 60, 68. But the Plaintiffs' position is, yet again, without basis. The Plaintiffs cite only to conversations between Mr. James and Mr. Kennedy about billing for his services. *See* Resp. to APA SMF ¶ 60. But despite extensive discovery, nothing presented by the Plaintiffs suggests that APA controlled or otherwise dictated who the AA Pilots Committee should hire as counsel. The Plaintiffs also fail to establish how the selection of Mr. Kennedy—other than the conflict of interest issue discussed and rejected above—could provide a basis for a breach of fiduciary duty claim on behalf of the legacy TWA pilots.

[33]      In the year prior to the LOA 12-05 arbitration, Mr. Clarke represented former TWA pilots in this Court, including Plaintiff Sikes. *See* Resp. to APA SMF ¶ 65. Mr. Clarke was also chosen by a group of former TWA pilots—including Plaintiffs Sikes, Horner, and Krakowski—to represent them after the LOA 12-05 arbitration in an internal proceeding at APA related to the unsecured claim obtained by APA in this bankruptcy. *See* Resp. to APA SMF ¶ 66.

[34]      The Plaintiffs offered no criticism of Mr. Clarke's performance in the arbitration, other than commentary along the lines of his being too "gentlemanly" and "long-winded." *See* Resp. to APA SMF ¶¶ 91–92. Such comments are clearly an insufficient basis for a duty of fair representation claim against APA. Indeed, even where

Turning to counsel for the AA Pilots Committee, the Plaintiffs argue that APA displayed substantial bias in retaining Mr. Kennedy, noting that Mr. Kennedy is outside counsel to APA and has long represented it, including in the AA/TWA merger and in connection with the AA/U.S. Airways merger. *See* Pl. Add'l Facts re: APA ¶¶ 59-61. Indeed, the TWA Pilots Committee asserted at the time that Mr. Kennedy had an ethical conflict of interest because he served as counsel to the AA Pilots Committee in the LOA 12-05 arbitration, and also as counsel to the committee advocating for all American pilots—including legacy TWA pilots—in the seniority merger with U.S. Airways. *See* Resp. to APA SMF ¶ 72.

But once again, the Plaintiffs' argument falls flat. APA hired an attorney specializing in legal ethics to review whether this "dual representation" would give rise to a conflict. *See* Resp. to APA SMF ¶ 75. The Plaintiffs do not dispute that the legal expert advised APA that there was no conflict of interest. *See* Resp. to APA SMF ¶ 78 (Plaintiffs admitting fact that ethics counsel advised APA there was no conflict because Mr. Kennedy did not represent the TWA Pilots Committee in the US Air integration); *see also* ¶¶ 75-76. Such an admission is fatal to the Plaintiffs' position. *See Bruce v. Local 333, Int'l Longshoremen's Ass'n*, 189 F. Supp. 2d 282, 288-90 (D. Md. 2002) (finding that union did not violate duty of fair representation because it reasonably believed that it was acting appropriately on the advice of counsel); *c.f. Power v. Kaiser Found. Health Plan of Mid-Atl. States Inc.*, 87 F. Supp. 2d 545, 553 n.19 (E.D. Va. 2000).

Furthermore, allegations of an appearance of impropriety do not establish a duty of fair representation claim given the lack of "causal connection between the union's wrongful conduct and [his or her] injuries." *Vaughn*, 604 F.3d at 709; *c.f. Price v. Int'l Union, United Auto.*

---

an employee's representative was not a licensed lawyer, duty of fair representation claims have been rejected absent evidence that the representative was incompetent or that a different representative would have produced better results. *See Mullen*, 1999 WL 974023, at *6; *Sales v. YM & YWHA of Washington Heights & Inwood*, 2003 WL 164276, at *9 (S.D.N.Y. Jan. 22, 2003).

*Aerospace & Agric. Implement Workers of Am.*, 927 F.2d 88, 94 (2d Cir. 1991) ("appearance of bias" with respect to arbitration procedures does not raise due process concerns and does not support a duty of fair representation claim) (citing *Andrews v. Educ. Ass'n of Cheshire*, 829 F.2d 335, 340-41 (2d Cir. 1987)).  The Plaintiffs do not provide evidence that Mr. Kennedy's role in the arbitration undermined the integrity of the process or changed the result, as the TWA Pilots Committee was given a full and fair opportunity to participate and argue their case.  *C.f. Carr*, 2016 WL 4061145, at *11 (union failure to prevent witness participation "did not seriously undermine[] the integrity of the arbitral process, which was otherwise fair, and which the neutral arbitrators—not [the union]—controlled, even if the failure violated [the union's] accounting and finance rules.") (internal citations and quotations omitted).  Indeed, the arbitrators rejected the proposal made by the AA Pilots Committee, which was presented by Mr. Kennedy.  *See* Resp. to APA SMF ¶¶ 113-14, 116.

### 4.   Allegations Relating to Arguments at Arbitration

The Plaintiffs also allege APA violated its duty of fair representation based on the positions taken by different parties during the arbitration, specifically the AA Pilots Committee proposal and APA's objection to the TWA Pilots Committee proposal.  *See* Compl. ¶¶ 48(I), (J).

#### i.  *Position of the AA Pilots Committee*

The Plaintiffs first argue that APA failed to prevent the AA Pilots Committee from taking a position that was unfair to the legacy TWA pilots.  The Plaintiffs appear to suggest that APA should have somehow repudiated the proposal of the AA Pilots Committee and defended the proposal of the TWA Pilots Committee.  But the Plaintiffs position represents a misunderstanding of APA's obligations with respect to the LOA 12-05 process.  On this issue, the Court finds persuasive the views in *Carr v. Airline Pilots Association, International*, 2016

WL 4061145 (S.D. Tex. July 29, 2016). *Carr* involved the seniority integration of two adverse

pilot groups in the merger of Continental and United Air Lines. *See id*. at *1. In *Carr*, the union

representing all of the pilot groups chose to integrate the merging carriers' seniority lists through

an arbitration process, pursuant to which each pilot group was represented by its own merger

committees. *See id*. at *2. The plaintiff, a Continental pilot, challenged the resulting arbitration

award, claiming that the union had violated its duty of fair representation for several reasons,

including by refusing to intervene when the United pilot group made improper political

arguments during the arbitration. *See id*. at *7.

In its decision, the *Carr* court recognized that "[u]nions have discretion when resolving

internal disputes between conflicted groups and their actions are judged by a 'wide range of

reasonableness.'" *Id*. at *9 (quoting *O'Neill*, 939 F.2d 1199, 1204 (5th Cir. 1991)). The district

court found that a union satisfies its duty of fair representation in those circumstances by

"establishing a 'fair process for determining seniority' . . . ." *Id*. (quoting *Air Wisconsin Pilots*

*Prot. Comm. v. Sanderson*, 909 F.2d 213, 216 (7th Cir. 1990)). The court noted that "[o]ne

example of a fair process is a process to refer disputes about seniority-list integration after

airlines merge to arbitration, under rules that require neutral arbitrators to integrate the seniority

lists without intending to favor one pilot group over the other." *Id*. (citing *Air Wisconsin*, 909

F.2d at 216). The court found that "[t]he duty of fair representation does not require a union to

ensure a "fair" result in resolving disputes, including disputes over seniority-list integration." *Id*.

(citing *O'Neill*, 939 F.2d at 1201). With respect to the union's failure to interrupt the allegedly

improper presentation of the United pilot group, the *Carr* court noted that there was no case law

to support "the proposition that a union must interject itself in this fashion into an arbitration that

has valid processes and procedures in place. Instead the case law appears to support the

proposition that a union's duty is satisfied by establishing neutral and valid processes and procedures for the arbitration." *Id*. at *15 (citing *Air Wisconsin*, 909 F.2d at 216).[35]

The ruling in *Carr* accords with the Second Circuit's view that—when a union is "faced with two groups of its members with objectives that [are] directly at odds"—"[s]ubmission of the impending dispute to arbitration [is] an equitable and reasonable method of resolving it." *Gvozdenovic*, 933 F.2d at 1107. In *Gvozdenovic*, the Second Circuit concluded that the union members in question had "fail[ed] to demonstrate that their interests were not fully represented in the arbitration proceeding" and therefore the groups at issue "were treated under the arbitration agreement with perfect parity." *Id*. (citing *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir. 1985)) (finding no violation of a union's duty of fair representation where the evidence demonstrated that the interests of all employee groups were represented vigorously throughout the proceedings).

Applying all these principles here, the Court finds that the process established by APA was reasonable and rejects the Plaintiffs' argument based on the position taken by the AA Pilots Committee.[36] Each side was treated in a neutral manner. Both were given the opportunity to fully represent themselves and state their positions during the arbitration proceedings through a representative empowered to independently advocate on their behalf. *See* Resp. to APA SMF ¶¶ 84-87, 104-07, 110, 111-14, 116-23. Thus, neither side could impose a "non-responsive" or "predatory" proposal, Pl. Opp. to APA SJM at 14, without facing rebuttal from the other. As the

---

[35]    The Plaintiffs argue that the *Carr* decision is inapplicable because the plaintiffs in *Carr* did "not attack core aspects of the . . . process or procedures." *Carr*, 2016 WL 4061145, at *10. But the Plaintiffs' claim with respect to the proposal made by the AA Pilots Committee is also not an attack on the procedures or process of the LOA 12-05 arbitration, but rather an attack on the substantive positions of the parties and the failure of APA to oppose those positions.

[36]    Relatedly, the Court rejects as nonsensical the Plaintiffs' argument that APA is somehow responsible for all the actions of the AA Pilots Committee because it was a committee of APA and was created pursuant to APA's Constitution and Bylaws. *See* Pl. Opp. to APA SJM at 15-16.

TWA Pilots Committee had the full opportunity to counter any arguments made by the AA Pilots Committee, APA had no obligation to interject itself into the process to prevent one group from making its own arguments or to support the arguments of the other side. This neutrality on the part of APA did not prevent the arbitrators from considering the relevant evidence and arguments put forward by both sides.[37]

### ii.   APA Objection to Proposals of TWA Pilots Committee

The Plaintiffs next argue that APA's objection to the proposal submitted by the TWA Pilots Committee constituted a breach of fiduciary duty. But this argument overlooks that APA's objection was a three-page brief objecting to two procedural aspects of the TWA Pilots Committee proposal for future arbitrations, and offered no comment on the substantive proposals of the TWA Pilots Committee regarding substitute job protections for Supplement CC. *See* Resp. to APA SMF ¶¶ 124-30. Indeed, the arbitrators saw APA as neutral in the process, noting that APA had delegated its advocacy position to the two pilot committees and took no position on the substantive positions submitted by those committees. *See* APA Ex. 1-F (12-05 Arbitration Merits Opinion at 6 n.9 [ECF No. 92-9]) ("For purposes of the presentations, and in recognition of starkly differing interests within the bargaining unit, APA delegated its advocacy position in this case to two committees composed of the former TWA pilots and the AA pilots, respectively. APA takes no position on the substantive positions submitted by the respective committees."). The TWA Pilots Committee had the opportunity to respond to APA's submission without interference and indeed did so. *See* Resp. to APA SMF ¶ 86.

---

[37]     The Plaintiffs also cannot meet the requirement of causation on this claim, as the Plaintiffs have not shown that APA's failure to oppose the AA Pilots Committee proposal impacted the result of the arbitration, since the arbitrators ultimately rejected the proposal made by the AA Pilots Committee. *See* Resp. to APA SMF ¶ 116.

In any event, the action of APA in responding to the TWA Pilots Committee's proposal on proceedings for future arbitrations was not arbitrary, discriminatory, or in bad faith. Rather, APA responded to the proposed procedures for future arbitrations in a way that was consistent with the governing text of LOA 12-05. Specifically, the APA brief opposed the proposal of the TWA Pilots Committee to appoint a "multi-party adjustment board" to resolve future disputes as inconsistent with LOA 12-05 and thus outside the jurisdiction of the arbitrators. *See* APA Ex. 1-H at 2 (APA Response to Proposal [ECF No. 92-11]). APA similarly opposed the TWA Pilots Committee's proposal to appoint a separate committee of legacy TWA pilots in the seniority integration between American and U.S. Airways as conflicting with LOA 12-05, which excluded seniority matters from the LOA 12-05 arbitrators' jurisdiction. *See* APA Ex. 1-H at 2-3 (APA Response to Proposal [ECF No. 92-11]). APA's position was that the latter proposal sought to "bind a future statutory panel," and that this would be "improper." APA Ex. 15 (James Depo. Tr. 104:21-22, June 14, 2016 [ECF No. 111-23]). Notably, the arbitrators rejected both of the procedural proposals made by the TWA Pilots Committee. *See* Resp. to APA SMF ¶ 130. The positions taken by APA—that would only affect future proceedings—were well within the "wide range of reasonableness" granted to unions in such circumstances, *O'Neill*, 499 U.S. at 67, served legitimate union interests, and did not run afoul of its neutrality on the question of what substitute job protections should be imposed by the arbitrators.[38] To rule otherwise would improperly and unfairly handcuff a union's ability to act to enforce the ground rules of arbitrations such as contemplated by LOA 12-05, even if the participants took positions that clearly violated those ground rules.

---

[38]    Once again, the Plaintiffs have failed to show causation here as the arbitrators declined to accept the TWA Pilots Committee's procedural proposals on the merits, despite the TWA Pilots Committee having had the full opportunity to present them. *See* Resp. to APA SMF ¶ 130 (citing APA Ex. 1-F, 12-05 Arbitration Merits Opinion at 19-20 [ECF No. 92-9]).

### iii.   Arguments Regarding APA Contacts with Arbitrators

The Plaintiffs also complain that APA failed to disclose a prior personal relationship between APA's general counsel, Edgar James, and Arbitrator Stephen Goldberg.  *See Plaintiffs' Supp. Memo. in Opp. to APA Renewed Mot. for Summ. J.* [ECF No. 127] ("Pl. Supp. Opp. to APA SJM") at 1-2.  The Plaintiffs assert that this caused unreasonable bias on the part of Arbitrator Goldberg towards Mr. James and APA, and that the failure of APA to disclose these contacts demonstrates bad faith by APA.  *See id.*

The Plaintiffs' allegations are based on an email exchange between Mr. James and Arbitrator Goldberg, regarding Arbitrator Goldberg attending a dinner party at the home of Mr. James.  *See* Pl. Ex. 27 (James and Goldberg emails [ECF No. 127-2]).  The Plaintiffs note that several weeks after the email exchange, Mr. James emailed Arbitrator Goldberg to ask him to participate in the LOA 12-05 arbitration.  *See id*.  Based upon this evidence, the Plaintiffs assert that the two were "obvious social friends" and had a "personal relationship" that would lead a reasonable person to conclude that Arbitrator Goldberg was biased in favor of Mr. James and would give Mr. James' input during the arbitration—or lack thereof—more weight than others.  *See* Pl. Supp. Opp. to APA SJM at 2-3.

To state a claim for a bad faith breach of the duty of fair representation, a plaintiff must allege that the union engaged in fraud, dishonesty, or other intentionally misleading conduct with an improper intent, purpose, or motive.  *See Vaughn,* 604 F.3d at 709–10.  There is no evidence of such an improper purpose, motive, or intent based on the undisputed facts here.  Arbitrator Goldberg was not chosen by Mr. James or APA but rather by Captain Gabel, chair of the TWA Pilots Committee.  *See* Resp. to APA SMF ¶¶ 51-52.  Indeed, Captain Gabel chose Arbitrator Goldberg specifically because he had ruled against American in a prior arbitration with APA.

*See* Resp. to APA SMF ¶¶ 51-52.  And as discussed extensively above, neither APA—nor Mr. James on its behalf)—took any positions during the arbitration regarding the substantive proposals made by the TWA Pilots Committee or the APA Pilots Committee during the arbitration.  Instead, APA formed two committees to advocate their own substantive positions in the arbitration and ultimately the arbitrators rejected the proposals made by both committees.  *See* Resp. to APA SMF ¶¶ 116, 122.

Finally, the Court notes that none of the cases relied upon by the Plaintiffs on this issue involve a duty of fair representation claim.  Rather, they are based on petitions to vacate an arbitration award based on an arbitrator's bias.  *See* Pl. Supp. Opp. to APA SJM at 2 (citing *Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 668 F.3d 60 (2d Cir. 2012); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132 (2d Cir. 2007); *Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79 (2d Cir. 1984); *Washburn v. McManus*, 895 F. Supp. 392 (D. Conn. 1994)).[39]  But the case currently before the Court is limited to fair representation claims "relating to how the arbitration was conducted," an issue which is "independent of a request to vacate an arbitration result."  *See Krakowski*, 536 B.R. at 372-73.  In fact, the Plaintiffs have filed another case in this Court seeking to vacate the arbitration award on exactly this basis, Adv. No. 16-01138 ("*Krakowski*

---

[39]    *See also Washburn v. McManus*, 895 F. Supp. 392, 399 (D. Ct. 1994) (to vacate an arbitration award, the relationship between the arbitrator and the party's principal must be so intimate as to cast doubt on the arbitrator's impartiality); *see also Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (2d Cir. 1984) ("[T]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all.").

*III*").[40]  Motions to dismiss have been briefed in *Krakowski III* and the Court will address the

request to vacate the arbitration award it in that case.[41]

### C. <u>Collusion Claim Against American</u>

The Court also grants American's motion for summary judgment with respect to the

Plaintiffs' claims that American colluded with APA in its alleged breach of the duty of fair

representation.  *See* Compl. ¶¶ 51-57.  The union's breach of its duty of fair representation is an

essential element to establish a claim of an employer's collusion.  *See United Indep. Flight*

*Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1283 (7th Cir. 1985); *see also Flight*

*Attendants in Reunion v. Am. Airlines, Inc.*, 813 F.3d 468, 475 (2d Cir. 2016).  As the Court

concludes that the Plaintiffs' claim that APA has breached its duty fails, the Court must also

conclude that the Plaintiffs' claim against American for collusion fails as well.  *See id.*

Even if there were claims remaining against APA, the Plaintiffs' collusion claims against

American suffer from several defects.  The majority of the Plaintiffs' claims against American

do not assert that American took any action in collusion with APA, but rather simply that

American had knowledge of APA's alleged breach of fiduciary duty.  But that is not enough

under applicable law.

---

[40]     The Court notes that motions to dismiss have been filed in *Krakowski III*.  *Krakowski III* is the third
adversary proceeding filed by the Plaintiffs before this Court related to the legacy TWA pilots obtaining alternative
job protections.  Due to the overlapping nature of these cases, the Court decided not to hear argument on the motions
to dismiss in *Krakowski III* until it fully resolved the overlapping issues that were raised in the motions for summary
judgment addressed in this current decision.  Now that these summary judgment motions have been resolved, the
Court directs the parties to contact Chambers to schedule oral argument on the motions to dismiss in *Krakowski III*
within 30 days of the date of this decision.

[41]     The Plaintiffs argue that it is incorrect to parse this case into the six specific allegations listed in the
Complaint.  They assert that their duty of fair representation claim against APA is based on a pattern of conduct, and
must be evaluated on the whole of the evidence and not any particular incident.  *See* Pl. Opp. to APA SJM at 3
(citing Compl. ¶ 49).  But the Court has examined each of the Plaintiffs' allegations and has found no basis for the
individual claims asserted by the Plaintiff.  This assessment does not change whether those allegations are evaluated
as a whole or parsed individually.

The Plaintiffs cite cases to support their position that an employer's knowledge of a breach by a union is sufficient for a collusion claim. But these cases all involve a hybrid claim, where a duty of fair representation claim against a union is combined with an allegation that the employer has breached the collective bargaining agreement. *See Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 796, 798 (2d Cir. 1974); *O'Mara v. Erie Lackawanna R.R. Co.*, 407 F.2d 674, 677, 679 (2d Cir. 1969); *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847 (2d Cir. 1961); *N.L.R.B. v. Am. Postal Workers Union*, 618 F.2d 1249 (8th Cir. 1980); *Am. Postal Workers Union, Local 6885*, 665 F.2d 1096 (D.C. Cir. 1981); *Sullivan v. Air Transp. Local 501 TWU*, 2004 WL 2851785, at *2-3 (E.D.N.Y. Dec. 6, 2004); *Musto v. Transp. Workers Union of Am., AFL-CIO*, 339 F. Supp. 2d 456, 469-71 (E.D.N.Y. 2004). There is no breach of contract claim in this case, and thus no hybrid claim upon which to anchor a claim of collusion against American based on mere knowledge. Indeed, the Court has already ruled against the Plaintiffs on this exact issue earlier in this case. *See Krakowsi*, 567 B.R. at 259-60 (rejecting Plaintiffs' argument that case law in the Second Circuit permits employees to add their employer as a defendant solely by alleging the employer's knowledge of the union's breach).

Absent such a hybrid claim, a plaintiff seeking to hold an employer liable for collusion must allege conduct by the employer evidencing bad faith, discrimination, or hostility towards the plaintiffs in connection with the union's alleged breach of its duty. *See, e.g., Rakestraw v. United Airlines, Inc.*, 765 F. Supp. 474, 493-94 (N.D. Ill. 1991) (dismissing claim against carrier even though carrier was aware of the animosity between the union and the minority group because there was no evidence that the carrier "acted in bad faith or discriminated against plaintiffs in accepting [the union's] proposal."), *aff'd in relevant part, rev'd in part*, 981 F.2d 1524 (7th Cir. 1992); *Cunningham v. United Airlines, Inc.*, 2014 WL 441610, at *6 (N.D. Ill.

Feb. 4, 2014) (holding that potential knowledge of union discrimination against its members is not enough to support a finding of collusion by the carrier, absent extreme factual scenarios).

The Plaintiffs only allege a few affirmative actions by American here, and none satisfy the standard for a collusion claim. For example, American entered into LOA 12-05 and the Protocol Agreement that established the scope of the arbitration. But the Plaintiffs have come forward with nothing to show that these actions were somehow collusive with a breach of fiduciary duty by APA. Turning to the conduct of the arbitration itself, American took no active role in selecting the arbitrators other than Arbitrator Bloch, but simply acquiesced to the decision of others.[42] *See* Resp. to American SMF ¶ 12. As discussed earlier, American had no involvement in, or knowledge regarding, the selection of the union committee members or their counsel. *See* Resp. to American SMF ¶¶ 17, 20-21. Nor did American adopt the proposal of either the AA Pilots Committee or the TWA Pilots Committee as to the alternative job protections to be awarded to the legacy TWA pilots. *See* Resp. to American SMF ¶¶ 26-31. In the face of these facts, the Plaintiffs raise two arguments, neither of which have merit.

First, the Plaintiffs rely on the failure of American to police APA's actions. *See Pl. Resp. to American Mot. for Summ. J.* at 14 [ECF No. 121] ("When examined as a whole, it is clear that American had knowledge of and was complicit in APA's breach."). For example, regarding APA's alleged breach of establishing the pilot committees and choosing the participants for the arbitration, the Plaintiffs assert that "American never questioned it" and "did not object to this

---

[42]     The Court finds no evidence of conduct by American that would constitute discrimination, bad faith or hostility towards the Plaintiffs or the legacy TWA pilots with respect to the Protocol Agreement appointing Arbitrator Bloch. For example, American and APA agreed on the choice of Arbitrator Bloch because he was a prominent Railway Labor Act arbitrator who was familiar to practitioners in the airline industry. *See* Resp. to American SMF ¶ 6. There is no evidence that American acted with an improper purpose or with animus against the legacy TWA pilots in acceding to the other parties' request to use Arbitrator Bloch here. Indeed, the negotiation of an agreement with a union—in and of itself—cannot constitute collusion. *See United Indep. Flight Officers*, 756 F.2d at 1283.

structure." Pl. Resp. to American Mot. for Summ. J. at 15. Similarly, on the Plaintiffs'

allegation that APA acted improperly in the selection of the counsel representing each of the

committees, Plaintiffs repeatedly argue that American engaged in collusion simply because

"American did nothing." *Id*. at 17.

But this is nothing more than a variation of the Plaintiffs' seeking to hold American liable

based on knowledge. It is not "appropriate to impose liability where the employer is charged

with nothing more than having acceded to the demands of the [u]nion, even with knowledge of

facts from which it might be inferred that the [u]nion was not fulfilling its duty of fair

representation to all of its constituents." *Am. Airlines Flow-Thru Pilots Coalition v. Allied Pilots

Ass'n*, 2015 WL 9204282, at *3 (N.D. Cal. Dec. 17, 2015). Doing so would require an employer

to supervise the actions of the union counterparty and make an independent evaluation of the

conduct and decisions of the union prior to entering a collective bargaining agreement. *See

Cunningham*, 2014 WL 441610, at *6. Such a requirement is unworkable, as

> [a] union does not automatically breach the duty of fair representation every time
> it negotiates for contracts in which some of its members are treated differently
> than others. At least outside contexts such as discrimination against protected
> classes, the onus should not be on the employer to evaluate and consider whether
> distinctions a union draws among its members are appropriate. Thus, something
> more than merely acceding to union demands must be alleged and proven to
> impose liability on an employer for 'colluding' in a breach of what ultimately
> remains the union's duty.

*Am. Airlines Flow-Thru*, 2015 WL 9204282, at *3; *see also Am. Postal Workers Union*, 665 F.2d

at 1109 ("The [employer] was required only to bargain in good faith with the employees'

exclusive representative, and, in so doing, it was expected to represent its own interests, not

those of the employees."); *Cunningham*, 2014 WL 441610, at *6 ("[T]he employer must in most

circumstances be able to rely on the union's disposition' in spite of some employee objections;

and it would have a detrimental effect on labor-management relations if an employer were forced

to ignore union representations and take the initiative in dealing with employees whenever it suspects a discriminatory union motive.") (internal citations and quotations omitted).

Second, the Plaintiffs claim collusion based on email communications between Arbitrator Goldberg and Mark Burdette, a consultant for American during the time of the LOA 12-05 arbitration. *See Plaintiffs' Statement of Additional Material Facts Regarding American* ("Pl. Add'l Facts re: American") [ECF No. 122] ¶ 6. Mr. Burdette was involved in the selection of arbitrators, the reviewing of proposals, and the development of contract language implemented pursuant to the arbitration opinion, and also testified on behalf of American during the arbitration. *See* Pl. Add'l Facts re: American ¶ 6. From January through July 2013, Mr. Burdette engaged in an email exchange with Arbitrator Goldberg about, among other things, Mr. Burdette's interest in serving as a mediator, and Mr. Burdette's preparation of a mock award for the arbitration that he shared with Arbitrator Goldberg after the arbitrators had issued their decision.[43]

---

[43]    In January 2013, Mr. Burdette emailed Arbitrator Goldberg to congratulate him on his appointment to the LOA 12-05 panel and inform Arbitrator Goldberg that Mr. Burdette would likely be participating in the case. *See* Pl. Add'l Facts re: American ¶ 7. Arbitrator Goldberg responded, "Thx for the note, but I'd rather see you as a member of the arbitration panel than as a witness. One of these days . . . ." Pl. Add'l Facts re: American ¶ 7 (quoting Goldberg email [ECF No. 122-8]). Arbitrator Goldberg was the founder of Mediation Research and Education Project, Inc. ("MREP"), a non-profit corporation of arbitrators and mediators. *See* Pl. Add'l Facts re: American ¶ 8. In March 2013, Mr. Burdette and Arbitrator Goldberg again emailed one another. *See* Pl. Add'l Facts re: American ¶ 9. During this exchange, Mr. Burdette asked, "You mentioned sometime back about training me and putting me on the MREP panel. Is that still a possibility?" Pl. Add'l Facts re: American ¶ 9 (quoting Burdette email [ECF No. 122-11]). The two then discussed the logistics of Mr. Burdette traveling to Chicago to receive MREP training by Arbitrator Goldberg. *See* Pl. Add'l Facts re: American ¶ 9. In this same email, Mr. Burdette commented to Arbitrator Goldberg that he thought Edgar James, an APA attorney, would recommend Arbitrator Goldberg to a lawyer for U.S. Airways for mediation work. *See* Pl. Add'l Facts re: American ¶ 10. Arbitrator Goldberg responded, in part, "By the way, I know that Ed is a great fan of yours. . . . He told me he thought you should be Senior V-P, HR (to which I wholeheartedly agreed)." Pl. Add'l Facts re: American ¶ 10 (quoting Goldberg email [ECF No. 122-11]). In April 2013, Mr. Burdette went to Chicago for MREP training and then became a member of MREP. *See* Pl. Add'l Facts re: American ¶ 11. In July 2013, Mr. Burdette and Arbitrator Goldberg had another email exchange, during which Mr. Burdette mentioned that he would be sending a voluntary contribution to MREP. *See* Pl. Add'l Facts re: American ¶ 12. Mr. Burdette also mentioned that he had prepared a mock award that he would share with Arbitrator Goldberg after the real award was released. *See* Pl. Add'l Facts re: American ¶ 13. After the arbitration decision was released, Mr. Burdette shared his mock award with Arbitrator Goldberg. *See* Pl. Add'l Facts re: American ¶ 14. American never disclosed the relationship between Mr. Burdette and Arbitrator Goldberg during the arbitration. *See* Pl. Add'l Facts re: American ¶ 15.

Based on the email exchange, the Plaintiffs argue that Mr. Burdette and Arbitrator

Goldberg had a "significant relationship" prior to Arbitrator Goldberg's appointment and that

this relationship caused Arbitrator Goldberg to be unreasonably biased towards American.  The

Plaintiffs argue that by choosing an arbitrator that was biased—and failing to disclose that bias to

the other participants—American was complicit in creating a hostile and discriminatory

arbitration that was weighted in its favor and against the Plaintiffs.

The question at hand, however, is not whether American itself breached some

independent duty owed by American to these legacy TWA pilots, but whether American

colluded in a breach of APA's duty of fair representation.  Seen in that light, these emails are

insufficient.  It is undisputed that APA had no knowledge of the communications between Mr.

Burdette and Arbitrator Goldberg.  *See* APA Ex. 17 (Burdette Depo. Tr. 73:23-85:11 [ECF No.

111-25]).  Moreover, the communications took place subsequent to Arbitrator Goldberg being

chosen,[44] further attenuating any claim that APA somehow breached its fiduciary duty of fair

representation in selecting the arbitrator.  Thus, these emails cannot be evidence of APA's breach

of duty or American's collusion in such an APA breach.  Nor do the communications suggest

hostile or discriminatory intent towards the Plaintiffs or the legacy TWA pilots.  *See* Pl. Exs. 8,

11-13 [ECF Nos. 122-8, 122-11, 122-12, 122-13].  Rather, they establish that Mr. Burdette was

engaged in a severely misguided attempt to further his career by becoming an arbitrator.  *See*

APA Ex. 17 (Burdette Depo. Tr. 82:15-20 [ECF No. 111-25]) (Mr. Burdette testifying that he

was not attempting to influence the arbitration award in any way).

---

[44] The first email cited by the Plaintiffs is from Mr. Burdette to Arbitrator Goldberg on January 10, 2013, in which Mr. Burdette congratulates Arbitrator Goldberg on having already been appointed to the LOA 12-05 arbitration panel.  *See Plaintiffs' Statement of Additional Material Facts Regarding American* [ECF No. 122] ¶ 7 (citing Pl. Ex. 8, Burdette email [ECF No. 122-8]).

Finally, the Court notes that the Plaintiffs in *Krakowski III* seek to vacate the arbitration award based on this same allegation of bias by Arbitrator Goldberg, and the Court will address any such claim of bias in that lawsuit.[45]

## CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment are granted and the Plaintiffs' motion to amend the Complaint is denied.  The Plaintiffs have failed to present an issue for trial with respect to APA because, considering to all the evidence in the Plaintiffs' favor, a reasonable juror could not find a breach of APA's duty of fair representation. The Plaintiffs have also failed to present an issue for trial with respect to their collusion claim against American given the failure of their breach of fiduciary duty against APA and because there is not affirmative action that would constitute collusion by American under applicable law.

The Defendants should settle an order on three days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to the Plaintiffs.

Dated: New York, New York
       June 12, 2018


                              */s/ Sean H. Lane*
                              UNITED STATES BANKRUPTCY JUDGE

---

[45]     The Plaintiffs have raised many arguments in their papers.  To the extent that an argument made by the Plaintiffs has not been specifically addressed by the Court in this decision, it is rejected as being insufficient to survive summary judgment.